## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| TERRY L. NORMORE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:18-CV-02506-E |
| | § | |
| DALLAS INDEPENDENT SCHOOL | § | |
| DISTRICT; DWAIN SIMMONS, in His | § | |
| Individual and Official Capacity, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Dallas Independent School District (DISD)'s motion for summary judgment, which seeks summary judgment on all of Plaintiff Terry Normore's remaining claims. (ECF Nos. 121, 122). The Parties have further filed motions to strike the other Party's respective summary judgment evidence. (ECF Nos. 145, 158). Last, the Court previously deferred ruling on Normore's motion for partial summary judgment on DISD's affirmative defenses, so the Court address that motion, hereunder. (ECF Nos. 125, 126). Having carefully considered the motions; the Parties' briefing; appendices; and the applicable law, for reasons that follow, the Court grants DISD's motion for summary judgment and denies the other three motions.

## I.   BACKGROUND

### A.  Normore's Work as Assistant Athletic Coordinator in 2016

From August 2007 to May 2017, Normore worked at L.G. Pinkston High School (Pinkston) as an English teacher. (ECF No. 114-1 at 2, 4-5; ECF No. 123-13 at 4, 6-7, 13).[1] Until the 2016-2017 school year, Normore also held duties at Pinkston as (i) an assistant athletic coordinator

---

[1] The record shows Normore also taught speech, theater arts, and journalism. (ECF No. 123-10 at 136).

(AAC)[2] and (ii) as the girls' basketball coach. (ECF No. 123-11 at 4; ECF No. 123-13 at 4). In 2016, Derwin Dukes—who served as Pinkston's athletic coordinator—oversaw Normore's coaching work. (ECF No. 123-11 at 5).[3] At that time, the Principal of Pinkston was Dwain Simmons. (ECF No. 123-11 at 4-5).

On or about June 22, 2016, Normore and a group of the girls' basketball team players painted a classroom at Pinkston for the girls' basketball team's use as a "female weight room" (Painting Incident). (ECF No. 123-11 at 5; ECF No. 123-13 at 30-31). However, Normore did not receive authorization from Simmons to paint the room; Normore assumed she could paint the room without discussing authorization with Simmons. (ECF No. 123-10 at 138-39; ECF No. 123-11 at 5).[4] On the morning of June 23, 2016, Simmons emailed Normore about the Painting Incident, stating it was "completely unauthorized." Normore was directed to stop painting, and Simmons indicated disciplinary actions would follow. On June 24, 2016, Simmons informed Normore that he was removing Normore from her position as AAC by phone call. (ECF No. 123-15 at 9-10; ECF No. 123-13 at 31). On July 19, 2016, Simmons emailed Normore the following:

---

[2] Throughout their briefing and record, the Parties refer to Normore's athletic work title as "assistant athletic director," "assistant athletic administrator," "female coordinator," and "assistant athletic coordinator" interchangeably. For consistency, the Court uses only the term "assistant athletic coordinator" or "AAC."

[3] The Parties refer to Dukes as "athletic coordinator" and "athletic director" interchangeably.

[4] Although Normore avers Simmons "fabricated" the prohibition on painting rooms, Normore refers the Court to evidence in the record that "beautification" projects "shall be cleared through the principal of the school." (ECF No. 151 at 17; ECF No. 114-25 at 160). During testimony at a later hearing, Normore testified as follows:

> [Question]: And did you go rogue and paint the room without any authorization?
> [Normore]: No, I did not.
> [Question]: Did you ever seek authorization from Principal Simmons?
> [Normore]: No.
> [Question]: Why did you not seek authorization from Principal Simmons?
> [Normore]: Because I had talked to Coach Dukes about painting the room several times . . . [Dukes] said, "Well, you and Simmons must still be on the same page because [Simmons] told me to paint the boys [sic] locker room."

(ECF No. 123-10 at 138). Normore later testifies Dukes told her it "would be a good idea" to paint the "girls [sic] locker room." (ECF No. 123-10 at 139).

---

Per our conversation earlier this summer in June, you told me Coach Dukes knew of you painting room 113 and that Assistant Principal Ms. Reed gave you permission to have the room. After a campus level inquiry both Coach Dukes and Ms. Reed denied those points; both are submitting written statements.

My expectations, at bare minimum, is for staff to obtain permission from me before making any major/changes of this sort and remain forthright in all communications. More importantly using students to paint a classroom without electricity, without ventilation, and without authorization from your building Principal or Athletics Coordinator are poor decisions - especially from an Assistant Coordinator and an accomplished veteran educator of your statue. That decision put students in a potentially dangerous and harmful situation.

In lieu of these evidence and findings, effective the 2016-2017 school year you will no longer serve as the Assistant Athletic Administrator/ Coordinator for Pinkston High School as discussed in our phone conversation in June.

(ECF No. 123-15 at 227). Thereafter, Normore engaged three processes to address her concerns with the termination of her AAC duties.

First, on July 29, 2016, Normore filed an internal grievance regarding Simmons's removal of her AAC position—which she later amended on August 8, 2016—through DISD's three-level grievance process (referred collectively as "Grievance").[5] (ECF No. 123-11 at 5; ECF No. 123-1 at 137-38; ECF No. 114-2 at 87-88). The amended grievance details Normore's concerns regarding the athletics department from 2015 to her "removal from her [AAC] position" on July 19, 2016. (ECF No. 114-2 at 87-88). The amended grievance focuses on Normore's desire for a female weight room. (ECF No. 114-2 at 87-88). In explaining the removal from her AAC duties, the amended Grievance states:

Simmons' [sic] reprimand was to remove me from my position as the Female Coordinator.  I asked him twice "So, you're removing me from my position because I painted a room?  Do you think that the punishment fits the crime?"
. . . .
I believe he is trying to justify his unjust decision.
. . . .

_____

[5] The Parties refer generally to the DISD board policies as "DGBA (Local)."

---

> I also believe that Mr. Simmons is retaliating because I asked for a female weight room and for my students and would not remove my assistant basketball coach and place a teacher in her place that he wanted, Ms. Parnell. Ms. Parnell has been given my Female Coordinator position. None of the male coaches have been held to same level of accountability as I have including Coach Dukes.

(ECF No. 114-2 at 87-88). On August 19, 2016, Normore waived her Level 1 Grievance Hearing—instead requesting for her Grievance to proceed directly to a Level II Grievance hearing before a DISD Hearing Officer. (ECF No. 123-1 at 139). After conducting a Level II Grievance Hearing, the DISD Hearing Officer denied the grievance on September 26, 2016—concluding, *inter alia*, "Grievant Normore has not shown that Principal Simmons failed to act in good faith or violated district policy or state or federal law." (ECF No. 123-1 at 143). Normore did not file a Level III grievance to appeal this decision nor otherwise request a hearing before a DISD board subcommittee. (ECF No. 123-1 at 11).

Second, in August 2016, Normore initiated a personnel complaint under DISD Board policy[6] to the District's Equal Employment Opportunity Compliance Manager (Personnel Complaint); her complaint was referred to the District's Professional Standards Office (PSO) for investigation. (ECF No. 123-1 at 12; ECF No. 123-1 at 145-47). Normore completed a corresponding questionnaire in which she alleged that Simmons discriminated against her on the basis of "sex, age and retaliation." (ECF No. 123-1 at 12; ECF No. 123-1 at 145-47). The questionnaire included the following question and response from Normore:

> State each and every instance of complained-of conduct for each person that you allege discriminated against you. Include each and every reference that the person made to your discriminatory characteristic (sex, race, religion, disability, etc.) including dates, times, and witnesses. Please list every circumstance that shows that the adverse action you suffered (termination etc.) is based on one of the protected categories.

---

[6] The Parties refer generally to the Personnel Complaint as "District Board policy DIA (Local)."

> Mr. Simmons removed me from the Assistant Athletic Coordinator position this summer. I spoke with him on the phone June 24, 2016 and he sent me a written statement via email July 2016.

(ECF No. 123-1 at 147).[7] PSO investigator Christine Mack completed a report for Normore's

Personnel Complaint. (ECF No. 123-1 at 148-65). Mack's report states:

> The investigation does not support that age, gender or retaliation were factors in Simmons removing Normore from the Assistant Athletics Coordinator position. No policy violations were sustained.

(ECF No. 12-1 at 149).

Third, on December 16, 2016, Normore filed a complaint with the United States Department of Education's Office for Civil Rights (OCR Complaint). (ECF No. 123-13 at 85-115). Normore's OCR Complaint checks and provides information relating to discrimination based on sex, age, and retaliation. (ECF No. 123-13 at 86-87).[8] On March 29, 2017, the Department of Education's Office for Civil Rights referred the OCR Complaint to the Equal Employment Opportunity Commission (EEOC). (ECF No. 123-13 at 117-18). Normore's response to the corresponding EEOC Intake Questionnaire from April 21, 2017, alleged that Dallas ISD discriminated and retaliated against her. (ECF No. 123-13 at 124-28).

## B.  Normore's Termination from Teaching

On May 18, 2017, Pinkston held an athletics banquet at a bowling alley; about 150 students, parents, volunteers, coaches, school administrators attended this athletics banquet. (ECF No. 123-11 at 5). Normore bowled in the company of several students, coaches, and parents. (ECF No. 123-11 at 6). While bowling, Normore fell on the bowling lane; people on the same lane assisted her; and the group reacted by laughing in a playful manner, along with Normore. (ECF No. 123-11 at

---

[7] The record of this questionnaire contains no attachments.

[8] Normore's OCR Complaint does not check or provide information relating to discrimination based on race, color, national origin, or disability.

6). Soon after the fall, Dukes joined Normore's group. (ECF No. 123-11 at 6). Dukes challenged Normore to bowl while he stood next to Normore and looked to the bowling lane. (ECF No. 123-11 at 6). Dukes testified that Normore then punched him on the chest, which caused him to take a step back (Punching Incident). (ECF No. 123-10 at 25). Dukes testified he felt pain and was confused by the incident; afterward, Normore and Dukes sat next to one-another in silence. (ECF No. 123-10 at 25).

After the banquet, Dukes reported the Punching Incident to Simmons and contacted Campus Officer Sepulveda—wanting to press criminal charges against Normore. (ECF No. 123-11 at 7). Simmons began a formal investigation regarding the Punching Incident: Simmons gathered facts, interviewed witnesses, collected written statements, wrote memorandums, and wrote an investigation report. (ECF No. 123-11 at 8). On June 2, 2017, Simmons submitted a recommendation letter to DISD's Legal Review Committee (LRC)—recommending that DISD terminate Normore from employment at Pinkston. (ECF No. 123-1 at 179). The letter stated:

> The recommendation to terminate is being made for the following reasons:
> **Violation of Professional Standard of Conduct for District Employees:**
> Failure to meet the District's standards of professional conduct.
>> • Continuous failure to maintain an effective working relationship, or maintain good rapport, with parents, the community, or colleagues.
>>
>> • Slander & Insubordination
>>
>> • Allegations of physical abuse of students and personnel

(ECF No. 123-1 at 179) (emphasis in original). Instead of pursuing termination on this recommendation, the LRC referred the matter to the PSO for further investigation; The PSO assigned Jennifer Morin to complete its investigation of the Punching Incident. (ECF No. 123-1 at 17-18; ECF No. 123-2 at 3). In September 2017, Morin obtained Normore's campus file, interviewed Dukes, and spoke with Simmons. (ECF No. 123-2 at 3). On September 25, 2017, the

PSO referred the investigation back to Simmons to complete as an administrator's investigation. (ECF No. 123-2 at 3). On October 4, 2017, after Simmons completed a second investigation report, Simmons again recommended Normore's termination by letter to the LRC—citing the same three failures to meet DISD's standards of professional conduct as before. (ECF No. 123-1 at 196).

On November 8, 2017, the LRC panel voted unanimously to terminate Normore's employment at Pinkston. (ECF No. 123-1 at 233). On November 13, 2017, DISD submitted a letter to Normore to notify her of the proposed termination for her employment; the letter stated:

> Dallas Independent School District Board Policies DF (LOCAL) and DFBA (LEGAL). *Board policy DFBA (LEGAL) states, inter alia, ''[a] Board may terminate a term contract and discharge a term contract employee at any time for (1) [g]ood cause as determined by the board*."
> . . . .
> Specifically, the recommendation to terminate your Contract comes as a result of findings from a recent Administrator's Investigation ("AI'') concerning allegations of physical violence toward a colleague and interference with a District investigation. *The AI found that you punched a colleague in the chest at a District athletics banquet, in front of other employees, parents and students*. Additionally, the AI found that you again threatened the same employee with physical violence; and further, contacted students and parents in an effort to coerce them to change their eyewitness accounts of your aggressive behavior.
>
> *The foregoing conduct violates Board policy*, Including DH (LOCAL), DH (EXHIBIT), DH (REGULATION) and AE (LOCAL) *and further constitutes good cause in support of this recommendation for termination*, including DF(LOCAL), paragraphs 1, 2, 10, 22, 25, 28, 29, 30 and 36.

(ECF No. 123-1 at 261-62) (emphasis added).

### C. Termination-Related Appeal, Hearing, and Ultimate Termination

On November 27, 2017, Normore appealed the proposed termination in accordance with Texas Education Code §§ 21.251-21.260—requesting the Texas Commissioner of Education assign an Independent Hearing Examiner (IHE) to handle the appeal hearing (TEA Appeal).[9] (ECF

---

[9] The Texas Commissioner of Education serves under the Texas Education Code as a part of the Texas Education Agency. *See, e.g.*, *Texas Educ. Agency v. Houston Indep. Sch. Dist.*, 660 S.W.3d 108, 117 (Tex. 2023).

---

No. 123-11 at 3; ECF No. 123-16 at 42). The Commissioner assigned Efren Ordoñez to serve as the IHE. (ECF No. 123-16 at 40-41). Mai Doshea Mullen Milton represented Normore during the TEA Appeal. (ECF No. 123-9). The Parties conducted discovery in conformity with the Texas Rules of Civil Procedure. (ECF No. 123-9 at 17). IHE Ordoñez conducted a two-day hearing— occurring on January 25 and 30th of 2018—which included (i) argument from counsel; (ii) witness testimony and cross-examination; (iii) admittance of exhibits into evidence; and (iv) transcription from a certified court-reporter. (ECF No. 123-10). During the TEA Appeal hearing, Dukes, Simmons, Morin, and Normore testified. (ECF No. 123-10). The Parties objected to testimony and evidence. (ECF No. 123-10). Both Parties further averred during the TEA Appeal that the burden of proof was by a preponderance of the evidence. (*See, e.g.*, ECF No. 123-10 at 180-81).

On February 8, 2018, IHE Ordoñez submitted his Recommendation of the Independent Hearing Examiner (IHE Recommendation)—which includes findings of fact, discussion of the allegations involving Normore, conclusions of law, and an ultimate recommendation. (ECF No. 123-11). *Inter alia*, the IHE Recommendation made the following findings of fact:

> 21. On or about May 2016 Coach Normore and a group of girls' basketball team players painted a room at Pinkston High School to be used by the girls' basketball team.
> 22. Coach Normore did not have authorization from Principal Simmons; and as result, in May 2016, Principal Simmons removed Coach Normore as the Assistant Athletic Director along with the stipend that goes with the position.
> . . . .
> 25. On May 18, 2017 (a Thursday) an end of year Athletics Banquet was held at USA
> Bowl in which student athletes were honored.
> . . . .
> 27. During the banquet event, Coach Normore was bowling in the company of several
> students, coaches, and parents.
> . . . .
> 32. While standing next to Coach Normore, AD Dukes challenged Coach Normore to bowl and then looked to the bowling lane. While looking at the lane, Coach Normore punched AD Dukes on the chest causing AD Dukes to take a step back.

---

33. AD Dukes felt pain from Coach Normore [sic] punch and felt confused by the incident. Both Coach Normore and AD Dukes then sat next to each other in silence.
. . . .
35. Ms. Patsy Wills, a parent who was with Coach Normore's bowling group, asserted on several and different occasions to different persons that Coach Normore had punched AD Dukes.
. . . .
41. Ms. Wills is a friend of Coach Normore.
. . . .
52. Principal Simmons specified in a memorandum dated March 19.2017, what was stated by Ms. Wills. []
53. . . . Ms. Wills asserted that Coach Normore's punch was "on purpose" and a real punch not meant in a playful manner and that the punch was forceful and unexpected by AD Dukes. Ms. Wills asserted that she was shocked by Coach Normore actions and felt the Coach Normore's actions were ''not right."

(ECF No. 123-11 at 5-8). The IHE Recommendation ultimately "RECOMMEND[ed] that [Normore]'s employment with the Dallas Independent School District be terminated." (ECF No. 123-11 at 17).

On February 15, 2018, a DISD board of trustees subcommittee comprised of Edwin Flores, Miguel Solis, and Audrey Pinkerton (DISD Board) held an open hearing regarding the IHE Recommendation to terminate Normore's employment with DISD. (ECF No. 123-12). After argument from both DISD and Normore, the DISD Board unanimously adopted and approved the findings of fact and conclusions of law of IHE Ordoñez in the IHE Recommendation. (ECF No. 123-12 at 6). Consequently, the DISD Board terminated Normore's employment with DISD. (ECF No. 123-12 at 6-7). Normore did not further appeal the decision to the Texas Commissioner of Education. (ECF No. 123-13 at 68).

### D. Procedural History

On June 15, 2018, Normore submitted an EEOC charge, which (i) only checked the boxes for discrimination based on sex, retaliation, and age and (ii) stated:

> I.   PERSONAL HARM:
> a. On March 1, 2018, I was wrongfully terminated from my position of
> Teacher/Head Basketball Coach by Respondent.
>
> II.   RESPONDENT'S REASON FOR ADVERSE ACTION:
> a. I was told that I assaulted and threatened an employee.
>
> II.   DISCRIMINATION STATEMENT:
> I believe that I was discriminated against because of my sex (Female), in violation
> of Title VII of the Civil Rights Act of 1964, as amended. I also believe that I was
> discriminated against because of my age (57), in violation of the Age
> Discrimination in Employment Act of 1967, and that I was retaliated against for
> participating in protected activity.

(ECF No. 10-1 at 3).[10] Thereafter, Normore received a Right to Sue letter from the EEOC. (ECF

No. 10-2).

On September 21, 2018, Normore initiated this litigation, asserting several claims against

both DISD and Simmons in his official capacity. (ECF No. 1). Normore later amended her

complaint. (ECF No. 10). The Court previously granted in part DISD's motion to dismiss.

*Normore v. Dallas Indep. Sch. Dist.*, No. 3:18-CV-2506-N, 2019 WL 2189258, at *3 (N.D. Tex.

May 21, 2019).[11] The Court further granted summary judgment in favor of Defendant Simmons—

dismissing all claims asserted against Simmons. *Normore v. Dallas Indep. Sch. Dist.*, No. 3:18-

CV-02506-E, 2021 WL 5824764, at *8 (N.D. Tex. Dec. 8, 2021). Notwithstanding, Normore'

lawsuit arises out of two adverse employment actions—(i) the removal from her position as AAC

---

[10] Under "Date(s) discrimination took place," Normore wrote "03-01-2018" under both the "Earliest" and "Latest" indicators. The Court further notes that although Normore's EEOC charge purports she was terminated on March 1, 2018, the summary judgment evidence shows the DISD Board's termination for Normore occurred at the open hearing on February 15, 2018. The record contains no evidence of DISD action on March 1, 2018.

[11] Specifically, the Court concluded

> The Court dismisses Normore's Title IX hostile work environment claim against DISD with prejudice. The Court also dismisses with prejudice Normore's Title VII and ADEA claims against DISD that are not based on her termination. This includes Normore's class action claims. Normore's remaining claims against DISD may proceed.

*Normore v. Dallas Indep. Sch. Dist.*, No. 3:18-CV-2506-N, 2019 WL 2189258, at *3 (N.D. Tex. May 21, 2019).

---

and (ii) the later termination of her employment. (*See generally* ECF No. 10). Normore's remaining claims are based on (i) 42 U.S.C. § 1983; (ii) sex-based discrimination and retaliation in violation of Title VII; (iii) age-based discrimination and retaliation in violation of the ADEA; and (iv) retaliation in violation of Title IX.[12]

DISD's motion for summary judgment seeks to dismiss all of Normore's remaining claims. DISD's motion for summary judgment also asserts that Normore's claims regarding her removal as AAC are time-barred and that the affirmative defense of collateral estoppel bars relitigation of fact issues that were adjudicated during the TEA Appeal. Normore has responded and further moved to strike certain evidence that DISD relies upon. DISD replied on its motion for summary judgment and further moved to strike evidence that Normore relies upon. Previously, Normore moved for partial summary judgment on DISD's affirmative defenses. Having been fully briefed, DISD's motion for summary judgment, Normore's motion for partial summary judgment, and corresponding motions to strike summary judgment evidence are ripe for consideration.

## II.   Summary Judgment Legal Standard

Summary judgment is appropriate when the pleadings and evidence on file show "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. A court must view all evidence and draw all reasonable inferences in the light most favorable to a party opposing a summary judgment motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). A court "may not make credibility determinations or weigh the evidence" in ruling on the motion. *Reeves*,

---

[12] The Court notes that Normore pleaded no intersectional discrimination claim.

530 U.S. at 150; *Anderson*, 477 U.S. at 254-55. Moreover, the evidence the non-movant provides must raise "more than ... some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586 (1986). The evidence must be such that a jury could reasonably find in the non-movant's favor. *Anderson*, 477 U.S. at 248. If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

The moving party bears the initial burden of showing the court there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party with the burden of proof on an issue "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis omitted). When, as here, a nonmovant bears the burden of proof, the movant may demonstrate it is entitled to summary judgment either by (1) *submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense*, or (2) *arguing there is no evidence to support an essential element of the nonmovant's claim or affirmative defense*. *Celotex*, 477 U.S. at 322–25 (emphasis added). There is "no genuine issue as to any material fact [if] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Furthermore, because DISD bears the burden of proof on its affirmative defenses at a trial, it "must establish 'beyond peradventure all of the essential elements of the . . . defense[s].'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.,* 878 F.Supp. 943, 962 (N.D. Tex. 1995) (quoting *Fontenot,* 780 F.2d at 1194).

Once the movant has made this showing, the burden shifts to the nonmovant to establish there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor.

*Celotex*, 477 U.S. at 324. "[C]onclusory allegations, speculation, and unsubstantiated assertions" will not satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1). A court "resolve[s] factual controversies in favor of a nonmoving party . . . only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).

"A party opposing such a summary judgment motion may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255–57). The Fifth Circuit has explained:

> The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. . . . "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992).

*Ragas*, 136 F.3d at 458. Regarding assertions of fact, Federal Rule of Civil Procedure 56 states:

> [i]f a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion [and] (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]

Fed. R. Civ. P. 56(e)(2)-(3).

## III.   ANALYTICAL FRAMEWORKS

Because several of Normore's claims allege discrimination or retaliation, the Court provides the following framework analyses, which are common to employment discrimination and retaliation claims. *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) ("To

succeed on a claim of intentional discrimination under Title VII, Section 1983, or Section 1981, a plaintiff must first prove a prima facie case of discrimination.") (collecting cases); *Richards v. Lufkin Indus., L.L.C.*, 804 F. App'x 212, 215 (5th Cir. 2020) (addressing retaliation claim asserted under Title VII).

### A. Employment Discrimination

"A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *see, e.g.*, *Gaalla v. Brown*, 460 F. App'x 469, 479 (5th Cir. 2012) (addressing racial discrimination). Regarding direct evidence, the Fifth Circuit has explained:

> Direct evidence [of discriminatory intent] is evidence which, if believed, proves the fact without inference or presumption. . . . It includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action.

*Gaalla*, 460 F. App'x at 479 (internal quotations omitted). "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Russell*, 235 F.3d at 222. Circumstantial evidence includes statements that merely suggest discriminatory motive or require the fact finder to draw an inference as to whether the comment is probative of an employer's discriminatory animus. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897-98 (5th Cir. 2002), *cert. denied,* 539 U.S. 926 (2003). The Fifth Circuit has explained the three-step *McDonnell Douglas* framework as follows:

> Under that framework, [a plaintiff] must make out a prima facie case of discrimination. *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021). If she succeeds, [a defending employer] must respond with a "legitimate, nondiscriminatory reason" for terminating [the plaintiff]. *Id.* at 282. Then the burden shifts back to [the plaintiff], who must counter with substantial evidence that [the defending employer's] proffered reason is pretextual. *Id.*

*Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022). The second step of the *McDonnell Douglas* framework requires an employer's *production* of a legitimate, nondiscriminatory reason for terminating a plaintiff, but this second step "can involve no credibility assessment." *Reeves*, 530 U.S. 133, 142 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).[13] Regarding the third step of the *McDonnell Douglas* framework, "the plaintiff can rely on evidence that the employer's reasons were a pretext for unlawful discrimination." *Russell*, 235 F.3d at 222 (citing *McDonnell Douglas*, 411 U.S. at 804).

### B. Employment Retaliation

"A plaintiff may prove a retaliation claim through direct or circumstantial evidence." *Jones v. Overnite Transp. Co.*, 212 F. App'x 268, 275 (5th Cir. 2006). "Without direct evidence, the plaintiff must establish [her] cause of action using circumstantial evidence and the *McDonnell Douglas* burden-shifting framework," discussed above. *Jones*, 212 F. App'x at 275. "If the plaintiff establishes a prima facie case, then the defendant must show a non-retaliatory, legitimate reason for the adverse action." Again, this second step of the *McDonnell Douglas* framework requires an employer to produce evidence of a non-retaliatory, legitimate reason for the adverse action—but requires no burden of persuasion. *See Jones*, 212 F. App'x at 275; *Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002) ("We agree that [t]he ultimate burden of persuading the trier of fact that the defendant [retaliated] against the plaintiff remains at all times with the plaintiff.") (internal quotation omitted). "Once the defendant meets this burden, the plaintiff must in turn offer evidence to create a genuine issue of material fact that the defendant's reason is not true, but is

---

[13] Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

---

MEMORANDUM OPINION AND ORDER                                    Page **15** of **59**

instead a pretext for discrimination." *Jones*, 212 F. App'x at 275; *see, e.g.*, *Gee*, 289 F.3d at 345 (discussing the same).

## IV.    NORMORE'S § 1983 CLAIMS (COUNT X)

### A.  Statute of Limitations on Normore's AAC § 1983 Claims

DISD first contends that Normore's § 1983 claims[14] related to her removal from the AAC position are time-barred because she did not bring them within the two-year statute of limitations. In response, Normore argues that she "filed her claims against DISD fewer than two years after the accrual date," and that her AAC position claims would therefore not be time-barred. (ECF No. 151 at 15).

The statute of limitations is an affirmative defense, and the burden of proof is on the party pleading it. *F.T.C. v. Nat'l Bus. Consultants, Inc.*, 376 F.3d 317, 322 (5th Cir. 2004). "The statute of limitations for a suit brought under § 1983 is determined by the general statute of limitations governing personal injuries in the forum state." *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001). "Since Texas has a two year statute of limitations for personal injury claims . . . [a Plaintiff] ha[s] two years to file suit from the date her claim accrued." *Piotrowski*, 237 F.3d at 576 (citing *Burrell v. Newsome,* 883 F.2d 416, 418 (5th Cir. 1989)); *accord Hatchet v. Nettles*, 201 F.3d 651, 653 (5th Cir. 2000).[15] "The time at which a § 1983 claim accrues is a question of federal law." *McDonough v. Smith*, 204 L. Ed. 2d 506, 139 S. Ct. 2149, 2155 (2019) (internal quotation omitted). "Under federal law, the [limitations] period begins to run the moment the plaintiff becomes aware that [s]he has suffered an injury or has sufficient information to know that [s]he

---

[14] Normore's corresponding § 1983 claims related to her AAC position involve due process, equal protection, and First Amendment retaliation claims.

[15] *See also* Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (promulgating a two-year personal injury-limitations period in Texas).

---

has been injured." *Piotrowski*, 237 F.3d at 576 (internal quotation omitted). Regarding this awareness of injury, the Fifth Circuit has stated

> A plaintiff's awareness encompasses two elements: "(1) The existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions." *Piotrowski I,* 51 F.3d at 516. A plaintiff need not know that she has a legal cause of action; she need know only the facts that would ultimately support a claim. *See Harrison v. United States,* 708 F.2d 1023, 1027 (5th Cir. 1983).

*Piotrowski*, 237 F.3d at 576. In employment cases, limitations periods "normally commence when the employer's decision is made." *Delaware State Coll. v. Ricks*, 449 U.S. 250, 506 (1980).

Here, the record shows Simmons informed Normore he was removing her from the AAC position on June 24, 2016, by phone call. (ECF No. 123-15 at 9-10; ECF No. 123-13 at 31). Normore's deposition testimony regarding this phone call with Simmons shows:

> Q. [Counsel] . . . Was he unequivocal in his call with you on June 24th that he was going to be removing you as assistant coordinator?
>
> A. [Normore] Yes, that's what he said.

(ECF No. 123-13 at 32). Normore affirmed in her deposition testimony that—in reference to Simmons's July 19, 2016 email—"as of July 19, 2016, [she] knew that the [AAC] position was being taken away from [her]." (ECF No. 123-13 at 34). The record contains Normore's original July 29, 2016 grievance, which states:

> SPECIFIC POLICY ALLEGEDLY VIOLATED
> . . . .
> Title IX and local policies and practices.
> . . . .
> I want to be returned to my position as the Female Coordinator at L. G. Pinkston High School[]
> . . . .
> Simmons' [sic] reprimand was to remove me from my position as the Female Coordinator. I asked him twice "So, you 're removing me from my position because I painted a room? Do you think that the punishment fits the crime?"
> . . . .
> I also believe that Mr. Simmons is retaliating[]

(ECF No. 123-1 at 133-34).

Although Normore avers she "had no reason to believe that DISD, had inflicted an injury at the time where she believed DISD's policies prevented discriminatory and retaliatory conduct," Normore fails to cite any evidence in support.[16] Instead, Normore argues that DISD gave her notice of her "final decision denying her [AAC] reinstatement" on September 22, 2016. (ECF No. 151 at 25). But again, Normore fails to cite any evidence in support. Assuming *arguendo* evidence from September 22, 2016 existed, the Court has previously addressed whether Normore's accrual date extended into September 2016:

> The Fifth Circuit has rejected the argument Normore makes. *See Merrill v. S. Meth. Univ.*, 806 F.2d 600, 605 (5th Cir. 1986). In *Merrill*, the issue was whether the plaintiff timely filed Title VII employment discrimination claims. *The Fifth Circuit recognized that the limitations period begins running on the date the plaintiff knows or reasonably should know that the discriminatory act has occurred. Id.* The plaintiff argued the court should focus on the date she first learned that a discriminatory motive caused the act, instead of the actual date of the act itself. *Id.* at 605. The Fifth Circuit rejected the plaintiff's proposal, noting "it might be years before a person apprehends that unpleasant events in the past were caused by illegal discrimination." *Id.*

*Normore*, 2021 WL 5824764, at *4 (emphasis added).

Here, DISD has demonstrated that Normore's AAC § 1983 claims accrued—at the latest—on or before July 29, 2016. Normore's own testimony and documents show that (i) Simmons verbally informed Normore that she was removed as AAC on June 24, 2016; (ii) Simmons emailed Normore that she was removed as AAC on July 19, 2016; and (iii) Normore asserted she was already removed from her AAC position in her original July 29, 2016 grievance. That is, the record shows Normore was (i) aware of the existence of the injury—removal of her AAC duties—as (ii) caused by Simmons's decision to remove her as AAC by phone call on June 24, 2016, and by

---

[16] "The court need consider only the cited materials[.]" Fed. R. Civ. P. 56(c)(3).

email on July 19, 2016. *Piotrowski*, 237 F.3d at 576; *see Ricks*, 449 U.S. at 506. Indeed, Normore indicated in her original July 29, 2016 grievance that Simmons had made an adverse employment decision regarding her AAC position—especially in light of Normore's references to violation(s) of Title IX and retaliation. *See Merrill v. S. Meth. Univ.*, 806 F.2d 600, 605 (5th Cir. 1986).

Thus, the latest time Normore became aware she either suffered an injury or had sufficient information to know she was injured was July 29, 2016, and this date is the accrual date for her AAC § 1983 claims. *See Piotrowski*, 237 F.3d at 576. It is undisputed that Normore filed her Complaint on September 21, 2018. (ECF No. 1). To have timely filed her AAC § 1983 claims, Normore would have had to initiate this proceeding—at the latest—on July 29, 2018, to remain within the two-year statute of limitations. *See Piotrowski*, 237 F.3d at 576. In light of the summary judgment evidence, DISD has established—beyond peradventure—its statute of limitations affirmative defense. As the filing date of Normore's Complaint exceeds two-years from July 29, 2016, the Court must conclude that Normore's AAC § 1983 claims are time-barred; the Court GRANTS DISD's motion for summary judgment as to the corresponding AAC § 1983 claims.[17]

### B.  Normore's Termination § 1983 Claims (Count X)

DISD argues Normore cannot maintain her termination § 1983 claims because (i) Normore cannot establish a violation of her constitutional rights and (ii) Normore has no evidence that a DISD policy, custom, or practice was a moving force behind a violation of her constitutional rights. In response, Normore alleges both constitutional violations and that DISD customs were the

---

[17] In her argument on these AAC § 1983 claims, Normore invites the Court to consider prior briefing in a separate summary judgment response, which was the subject of the prior opinion. *See Normore v. Dallas Indep. Sch. Dist.*, No. 3:18-CV-02506-E, 2021 WL 5824764, at *4 (N.D. Tex. Dec. 8, 2021). As discussed hereunder, the Court declines to consider such briefing. Assuming *arguendo* the Court were to consider Normore's prior briefing, the Court would reject her arguments under the same analysis as found in the prior opinion. *Normore*, 2021 WL 5824764, at *4-5.

---

moving force behind her termination. Regarding her termination, Normore has pleaded § 1983 claims based on due process, equal protection (based in age and sex), and First Amendment rights.

       *i.*       *Section 1983 Claims, Generally*

To state a claim under § 1983, a Plaintiff must allege: (i) "some person has deprived [her] of a federal right" guaranteed by the United States Constitution or federal law; and (ii) "the person who deprived [her] of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The existence of a constitutional violation is a "threshold" requirement in any § 1983 claim. *Peterson v. City of Fort Worth*, 588 F.3d 838, 844 (5th Cir. 2009). "[W]ithout an underlying *constitutional* violation, there can be no § 1983 liability[.]" *Becerra v. Asher*, 105 F.3d 1042, 1047 (5th Cir. 1997) (emphasis in original).

"Municipal liability under 42 U.S.C. § 1983 requires proof of 1) a policymaker; 2) an official policy; 3) and a violation of constitutional rights whose "moving force" is the policy or custom." *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (citing *Piotrowski*, 237 F.3d at 578; *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). As the Fifth Circuit has stated:

> The policymaker must have final policymaking authority. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988). Municipal liability cannot be sustained under a theory of *respondeat superior. Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997); *Piotrowski*, 237 F.3d at 578. "[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski*, 237 F.3d at 578. Therefore to sustain liability under § 1983, the [Plaintiff] must point to more than the actions of a [school district] employee, [Plaintiff] must identify a policymaker with final policymaking authority and a policy that is the "moving force" behind the alleged constitutional violation.

*Rivera*, 349 F.3d at 247. The Supreme Court has explained that a governmental entity—such as DISD—may not be held liable under § 1983 "unless action pursuant to official municipal policy

of some nature *caused* a constitutional tort." *Monell*, 436 U.S. at 691 (emphasis added). In

discussing *Monell* the Supreme Court has further explained:

> [A] plaintiff must show that the municipal action was taken with the requisite
> degree of culpability and must demonstrate a *direct causal link between the*
> *municipal action and the deprivation of federal rights*. Pp. 1387–1388.

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. at 397, 404 (1997) (emphasis

added). The Court next discusses (i) DISD's policymaker and (ii) Normore's acclaimed

deprivations of federal right(s) based on due process, equal protection, and First Amendment

rights. Additionally, for the reasons enumerated hereunder, the Court pretermits discussion of

DISD's policies in the § 1983 context.

ii.      *DISD's Policymaker*

"[W]hether a particular official has final policymaking authority is a question of state law."

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (internal quotations omitted). Under

Texas Law, an independent school district is governed by a board of trustees who "as a body

corporate have the exclusive power and duty to govern and oversee the management of the public

schools of the district." Tex. Educ. Code Ann. § 11.151(b). Here, it is undisputed that the DISD

Board is the final policymaking authority. *See Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1245

(5th Cir. 1993) ("Texas law is clear that final policymaking authority in an independent school

district, such as the DISD, rests with the district's board of trustees."). The Court next addresses

Normore's acclaimed constitutional torts.

iii.      *Normore's Due Process Claims (Fourteenth Amendment)*

"'To state a Fourteenth Amendment due process claim under § 1983, "a plaintiff must first

identify a protected life, liberty or property interest and then prove that governmental action

resulted in a deprivation of that interest.'" *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010)

(quoting *Baldwin v. Daniels*, 250 F.3d 943, 946 (5th Cir. 2001)). A claim under the Fourteenth Amendment may proceed under substantive due process or procedural due process. *See generally Steward v. City of New Orleans*, 537 F. App'x 552, 556 (5th Cir. 2013). Here, Normore has asserted both substantive and procedural due process claims, and DISD has moved for summary judgment on both claims.

A) Substantive Due Process Claim

"To succeed with a claim based on substantive due process in the public employment context, the plaintiff must show two things: (1) that [s]he had a property interest/right in [her] employment, and (2) that the public employer's termination of that interest was arbitrary or capricious." *Lewis v. Univ. of Texas Med. Branch at Galveston*, 665 F.3d 625, 630 (5th Cir. 2011) (internal quotation omitted). "Substantive due process bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Lewis*, 665 F.3d at 630 (internal quotation omitted). The Fifth Circuit has further stated

> Nonetheless, "substantive due process requires only that public officials exercise professional judgment, in a nonarbitrary and noncapricious manner, when depriving an individual of a protected property interest." *Texas v. Walker,* 142 F.3d 813, 819 (5th Cir. 1998) (citing *Regents of the Univ. of Mich. v. Ewing,* 474 U.S. 214, 223–26, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)). The fact that "reasonable minds could disagree on the propriety of [the plaintiff]'s termination" is insufficient to defeat a public official's qualified immunity against a substantive due process claim. *Id. Rather, the plaintiff must show that the decision was "made without a rational connection between the known facts and the decision or between the found facts and the evidence." Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.,* 168 F.3d 211, 215 (5th Cir. 1999) (quotation marks omitted). *The plaintiff must "demonstrate that the abuse of power by the state official shocks the conscience." Marco,* 489 F.3d at 673 n. 3 (quotation marks omitted) (finding award of advertising contract to bidder other than lowest did not "shock the conscience," and thus did not establish violation of substantive due process).

*Lewis*, 665 F.3d at 630–31 (emphasis added). "Judicial evaluation of academic decisions requires deference and they are overturned only if they are 'such a substantial departure from accepted

academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'" *Williams v. Texas Tech. Univ. Health Scis. Ctr.*, 6 F.3d 290, 294 (5th Cir. 1993) (quoting *Regents of the Univ. of Michigan v. Ewing,* 474 U.S. 214, (1985); *see, e.g.*, *Johnson v. Houston Indep. Sch. Dist.*, 930 F. Supp. 276, 287 (S.D. Tex. 1996) (applying the same reasoning to a case in which public employees were terminated from positions as special education supervisors).

DISD does not challenge whether Normore had a property interest in her employment as a teacher. Instead, DISD first argues that Normore's termination was neither arbitrary nor capricious. In response, Normore asserts several claims that the DISD Board's handling of the TEA Appeal proceedings under the Texas Education Code were "the moving force behind the arbitrary and capricious nature of Normore's termination." (ECF No. 151 at 54-55); *see* Tex. Educ. Code Ann. §§ 21.251-.261.

As discussed above, the record shows the DISD Board ultimately terminated Normore at an open hearing after adopting the findings of fact and conclusions of law of IHE Ordoñez, who held two days of hearings. Through adoption of the IHE Recommendation, the DISD Board found (i) that Normore punched Dukes and (ii) that conduct constituted good cause to terminate Normore's employment. Although Normore asserts various complaints about the DISD Board, her record citations do not support such assertions. Although Normore asserts various complaints about the nature of the TEA Appeal and the proceedings thereof, Normore's complaints are unsupported by the record. No evidence in the record shows the DISD Board was arbitrary or capricious in the decision to terminate Normore. No evidence in the record otherwise demonstrates that the DISD Board's actions "shock the conscience" or depart from "accepted academic norms." *See Lewis*, 665 F.3d at 630–31; *Williams*, 6 F.3d at 294. To the contrary, the record shows DISD

terminated Normore after evidentiary hearing and open hearing because DISD believed Normore assaulted a co-worker at an off campus, work-related event with students' parents attending. In light of the summary judgment evidence, the Court must conclude there is no evidence on the second element of Normore's termination-based substantive due process claim. Accordingly, the Court GRANTS DISD's motion for summary judgment as to Normore's termination-based substantive due process claim.

B) Procedural Due Process Claim

Regarding procedural due process, "[a]n essential principle . . . is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (internal quotation omitted). The Supreme Court has "described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing before [s]he is deprived of any significant property interest.'" *Loudermill*, 470 U.S. at 542 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (emphasis in original)). "This principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Loudermill*, 470 U.S. at 542 (internal citation omitted). "The essential requirements of due process . . . are notice and an opportunity to respond." *Galloway v. State of La.*, 817 F.2d 1154, 1158 (5th Cir. 1987) (quoting *Loudermill*, 470 U.S. at 533, 546). The Fifth Circuit described:

> The hearing need not be elaborate, however.
> . . . .
>> The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.

*Galloway*, 817 F.2d at 1158 (5th Cir. 1987) (block quoting *Loudermill*, 470 U.S. at 546).

---

MEMORANDUM OPINION AND ORDER                                      Page **24** of **59**

DISD asserts it afforded Normore "all due process owed to her: notice and an opportunity to be heard regarding her termination." (ECF No. 122 at 30) (citing *Loudermill*, 470 U.S. at 546). In response, Normore asserts that the DISD Board was "deliberately indifferent" to several issues regarding the PSO and other referential portions of her termination process.

It is undisputed that DISD's November 13, 2017 letter (i) notified Normore of the recommendation to terminate her employment; (ii) provided instructions on appealing the recommendation to the Commissioner of Education to obtain a TEA Hearing; and (iii) further directed Normore to the DISD Employee Relations Office for any additional questions. Thereafter, it is undisputed that Normore availed herself of the TEA Appeal and received a two-day evidentiary hearing with IHE Ordoñez and an additional open hearing in which the DISD Board heard argument from Normore's counsel. Thus, DISD met the essential requirements of due process—notice and an opportunity to respond. *Galloway*, 817 F.2d at 1158. The record shows Normore received oral and written notice of the charges against her, an explanation of DISD's evidence, and an opportunity to present her side of the story. *See Loudermill*, 470 U.S. at 546. Based on the record, the Court must conclude Normore was afforded procedural due process. *See Loudermill*, 470 U.S. at 542. The record is devoid of evidence that Normore was not provided notice and an opportunity to respond to the circumstances of her termination; thus, there is no evidence to support that element of a procedural due process claim. Accordingly, the Court GRANTS DISD's motion for summary judgment as to Normore's termination-based procedural due process claim.

iv.     *Normore's Equal Protection Claims (Fourteenth Amendment)*

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a

direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe,* 457 U.S. 202, 216 (1982)). The Fifth Circuit has explained that § 1983 and Title VII are "parallel causes of action." *Lauderdale v. Texas Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157, 166 (5th Cir. 2007) (citing *Cervantez v. Bexar County Civil Serv. Comm'n,* 99 F.3d 730, 734 (5th Cir. 1996)).[18] To establish a violation of the Equal Protection Clause in the employment context, a plaintiff must prove a discriminatory purpose or motive. *Mitchell v. Mills*, 895 F.3d 365, 370 (5th Cir. 2018).

Here, DISD moved for summary judgment on both of Normore's equal protection claims— based in age and sex. However, Normore's response only addresses her sex-based equal protection claim—not her age-based equal protection claim. (ECF No. 151 at 55-57).  When a plaintiff fails to defend a claim in response to a motion to dismiss or summary judgment motion, the claim is deemed abandoned. *See Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (concluding that the plaintiff abandoned her retaliatory abandonment claim when she failed to defend the claim in response to a motion to dismiss); *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983) (explaining that a plaintiff, "in his opposition to a motion for summary judgment cannot abandon an issue and then . . . by drawing on the pleadings resurrect the abandoned issue.").[19] Thus, the Court must conclude Normore has abandoned her age-based equal

---

[18] Furthermore, the "inquiry into intentional discrimination is essentially the same for individual actions brought under sections 1981 and 1983, and Title VII." *Wallace v. Tex. Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir. 1996) (citing *Briggs v. Anderson,* 796 F.2d 1009, 1019–21 (8th Cir. 1986)).

[19] *See, e.g., Cantu v. Freedom Mortg. Corp.*, No. 3:19-CV-01701-B, 2021 WL 356840, at *2 (N.D. Tex. Jan. 4, 2021), report and recommendation adopted, No. 3:19-CV-01701-B, 2021 WL 351409 (N.D. Tex. Feb. 2, 2021); *see also Scales v. Slater*, 181 F.3d 703, 708 n. 5 (5th Cir. 1999) (plaintiff abandoned claim by failing to contest defendant's arguments for dismissal of that claim); *Gray v. Wal-Mart Stores Tex., LLC*, 2020 WL 7327994, at *4 (N.D. Tex. Nov. 6, 2020) (Rutherford, J.), *rec. adopted*, 2020 WL 7322737 (N.D. Tex. Dec. 11, 2020) ("Because Plaintiff has offered no evidence raising a material fact issue as to any element of her ... claim—indeed, she has not responded or offered any evidence [at] all—the Court finds that Plaintiff has abandoned her claim....").

protection claim. The Court next addresses Normore's sex-based equal protection claim under both the direct evidence and *McDonnell Douglas* frameworks.

DISD first asserts no direct evidence exists of sex-based discrimination. In response, Normore asserts direct evidence exists of discriminatory intent with corresponding record citations.[20] As defined above, direct evidence proves a fact without inference or presumption. *See Gaalla*, 460 F. App'x at 479. Here, none of the evidence of sex-based discrimination that Normore cites meets the aforementioned definition of "direct evidence." Normore refers to (i) the athletics department referring to Normore as "Ms. Personality"; (ii) the Painting Incident as "fabricated"; (iii) that Dukes would have reacted differently to the punch, had Normore been a man; and (iv) the inference that the DISD board would have made a different decision, had Normore been a man. (ECF No. 151 at 28-30).[21] However, Normore's corresponding, cited summary judgment evidence demands "inference or presumption" to qualify as evidence of discriminatory intent. *Gaalla*, 460 F. App'x at 479. The record is otherwise devoid of direct evidence that DISD (i) denied Normore the equal protection of the law or (ii) had a discriminatory purpose or motive. Thus, the Court must conclude the record contains no direct evidence of sex-based discriminatory intent.

DISD next asserts Normore cannot meet her sex-based equal protection claim burden through circumstantial evidence—the *McDonnell Douglas* framework. To first establish a prima facie case, Normore must show:

> **(1)** [s]he is a member of a protected class, **(2)** [s]he was qualified for the position at issue, **(3)** [s]he was the subject of an adverse employment action, and **(4)** [s]he was treated less favorably because of [her] membership in that protected class than

---

[20] Normore's briefing addresses direct evidence of sex-based discriminatory animus in her briefing regarding her Title VII sex-based discrimination and retaliation claims. As the standards under Title VII and § 1983 are essentially the same, the Court addresses Normore's purported direct evidence in both contexts. *See Wallace*, 80 F.3d at 1047.

[21] The record suggests that, had Normore been a man, Dukes would have fought back after the punch. (ECF No. 123-10 at 25).

---

were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.

*Giles v. Shaw Sch. Dist.*, 655 F. App'x 998, 1002 (5th Cir. 2016) (block-quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)) (bracketed revisions in original, emphasis added in bold); *see also Lee v. Conecuh Cnty. Bd. of Ed.*, 634 F.2d 959, 962 (5th Cir. 1981) (recognizing the application of *McDonnel Douglas* to equal protection claims). As to this fourth requirement, the Fifth Circuit has explained:

> The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been "nearly identical" to that of the proffered comparator who allegedly drew dissimilar employment decisions. If the "difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer," the employees are not similarly situated for the purposes of an employment discrimination analysis.

*Lee*, 574 F.3d at 260 (footnotes omitted, emphasis in original). "The similarly situated employee is known as a comparator." *Saketkoo v. Administrators of Tulane Educ. Fund*, 31 F.4th 990, 998 (5th Cir. 2022) (addressing gender discrimination claim under Title VII).

Here, it is undisputed that Normore (i) was a member of a protected class—in this equal protection context, a female; (ii) was qualified[22]; and (iii) was subject to an adverse employment action—termination of her employment. DISD only disputes the fourth element of this claim— whether Normore was treated less favorably because she is a female than were other similarly situated employees who are male, under nearly identical circumstances. DISD asserts Normore's termination was based "solely on Normore's misconduct"—therefore, not on her sex. (ECF No. 122 at 36). Normore, throughout her briefing, proffers several male comparators as "similarly

---

[22] Indeed, the IHE Recommendation finds "Normore is a good teacher and coach." (ECF No. 123-11 at 4).

situated"—Simmons, Dukes, and other male employees. However, the record does not support that Simmons was "similarly situated" as Normore because (i) it is undisputed that Simmons was the principal of Pinkston whereas Normore was a teacher who served as AAC and coached girls' basketball and (ii) no evidence in the record shows that Simmons was a teacher, served as AAC, or coached girls' basketball. Notwithstanding, the record is devoid of evidence that Simmons shared the same supervisor as Normore. Similarly, the record does not support that Dukes was "similarly situated" as Normore because (i) it is undisputed that Dukes was the football coach and athletics director at Pinkston whearas Normore held neither of those positions and (ii) no evidence in the record shows Dukes was a teacher or coached girls' basketball. Regarding the other male employees, the record is devoid of evidence that (i) that they held the same job or responsibilities as Normore; (ii) shared the same supervisor; or (iii) had their employment status determined by the same DISD Board. The summary judgment evidence contains no comparable violation histories of any other DISD employee.

Otherwise, Normore directs the Court to various evidence of alleged sex-based disparate treatment: (i) that the TEA Appeal lacked jurisdiction to adjudicate claims of discrimination or retaliation; (ii) that the Board "was aware that Simmons" wanted to discharge Normore; (iii) the PSO investigation of the Painting Incident; (iv) that Simmons denigrated women and praised men regarding administrative tasks; (v) that the DISD Board ignored certain alleged facts relating to the Pinkston dress code; and (vi) Simmons's reliance on Dukes's statement(s). (ECF No. 151 at 56-57). However, as cited, this evidence either (i) does not support Normore's corresponding assertions or (ii) does not show sex-based disparate treatment. Furthermore, none of the evidence cited shows Normore was treated less favorably—here, terminated from work—than a similarly situated male employee under nearly identical circumstances. There is no evidence that any of

Normore's proffered comparators engaged in "nearly identical" conduct as Normore—punching a coworker at an off-campus, work-related event with students' parents attending. *See Giles*, 655 F. App'x at 1002; *Lee*, 574 F.3d at 260.[23] Otherwise the record is devoid of evidence that the DISD Board decided to terminate Normore due to a discriminatory purpose or motive based in sex.

The Court must conclude there is no evidence of the fourth element of Normore's prima facie equal protection case under the *McDonnell Douglas* framework. For those reasons and in light of the summary judgment evidence, the Court must conclude that Normore fails to establish a prima facie case of sex-based equal protection violation of the Fourteenth Amendment. Correspondingly, the Court GRANTS DISD's motion for summary judgment as to Normore's termination-based equal protection claim.

> v.      *Normore's First Amendment Retaliation Claim*

"A state may not retaliate against an employee for exercising her First Amendment right to free speech." *Bradshaw v. Pittsburg Indep. Sch. Dist.*, 207 F.3d 814, 815 (5th Cir. 2000). The Fifth Circuit has enumerated four elements required to establish a First Amendment retaliation claim:

> To establish a § 1983 claim for employment retaliation related to speech, a plaintiff-employee must show: **(1)** [s]he suffered "an adverse employment action," *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir.2004); **(2)** [s]he spoke "as a citizen on a matter of public concern," *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 1958, 164 L.Ed.2d 689 (2006); **(3)** [her] interest in the speech outweighs the government's interest in the efficient provision of public services, *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); and **(4)** the speech "precipitated the adverse employment action." *Eeds,* 392 F.3d at 142.

---

[23] Normore testified she did not know of any other Pinkston employee under Simmons's leadership who had a physical altercation of any kind with a colleague. (ECF No. 123-13 at 56). Normore was not sure of any other Pinkston employee reported to have "smacked" or "punched" a colleague. (ECF No. 123-13 at 56).

---

*Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007) (emphasis added in bold). With regard to the fourth requirement, "under the Supreme Court's *Mt. Healthy* doctrine, [a plaintiff's] protected speech must be the "but for" cause of the adverse employment in order to support [her] retaliation claims under the First Amendment." *Moore v. Huse*, 578 F. App'x 334, 339 (5th Cir. 2014) (citing *Hartman v. Moore,* 547 U.S. 250, 260 (2006); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

Here, DISD challenges the second and fourth elements—whether Normore spoke as a citizen on a matter of public concern and whether her speech precipitated the adverse employment action. In response, Normore asserts that her termination was based on her speech about "gender inequality." (ECF No. 151 at 57-60). Normore's briefing on her First Amendment speech protections falls into two categories: (i) Normore's concerns regarding the weight-room equipment at Pinkston and her desire to address "disparity in the female and male athletic programs and requesting assistance help [sic] to improve the female athletic program at Pinkston" and (ii) Normore's December 16, 2016 OCR Complaint.[24] (ECF No. 151 at 57-58).

Here, the Court pretermits discussion of whether Normore spoke as a citizen on a matter of public concern[25] because there is no evidence in the record to support that Normore's speech precipitated her termination. Although the record shows evidence of (i) the investigation of the Painting Incident and the Punching Incident; (ii) the TEA Appeal hearings before IHE Ordoñez; and (iii) the open hearing before the DISD Board—none of the evidence shows Normore's exercise of any speech precipitated the termination. The record of the TEA Appeal hearings and open

---

[24] The record shows one solution Normore preferred was to have a separate weight room for the girls. When asked whether Normore was "aware of any Dallas ISD schools that had separate weight rooms for female and male athletes," Normore responded "I'm not aware." (ECF No. 123-13 at 26). The record otherwise does not contain evidence that any Dallas ISD school had separate weight rooms for females and males.

[25] Normore provides no briefing as to how or why any of her speech constituted a matter of public concern.

---

MEMORANDUM OPINION AND ORDER                                      Page **31** of **59**

hearing before the DISD board contain no testimony or discussion, whatsoever, of Normore's First Amendment concerns. Instead, the TEA Appeal hearings and open hearing before the DISD board focus on the allegations that Normore punched Dukes. Similarly, the record of DISD's November 13, 2017 letter proposing her termination and Normore's June 15, 2018 Charge both focus on the same reason for adverse action of termination—that Normore assaulted and threatened[26] another employee. The record shows no causal link between Normore's purported First Amendment speech and her termination. In light of the record, the Court must conclude there is no evidence that Normore's asserted First Amendment speech precipitated the adverse employment action of her termination at DISD. The record is otherwise devoid of evidence that would support this causality element—the fourth element of Normore's First Amendment retaliation claim. For those reasons, the Court GRANTS DISD's motion for summary judgment as to Normore's termination-based First Amendment retaliation claim.

vi.    *DISD's Policies*

With regard to whether a policy exists, "[o]fficial policy is ordinarily contained in duly promulgated policy statements, ordinances or regulations." *Piotrowski*, 237 F.3d at 579. However, the Fifth Circuit has also explained that

[] a policy may also be evidenced by custom, that is:

(2) . . .. a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy . . . Actions of officers or employees of a municipality do not render the municipality liable under section 1983 unless they execute official policy as above defined.

---

[26] The record contains no evidence that any speech related to a threat constituted the speech Normore claims was protected by the First Amendment.

*Piotrowski*, 237 F.3d at 579 (block quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.), on reh'g, 739 F.2d 993 (5th Cir. 1984)). Thus, to maintain her § 1983 claims, Normore must show that (i) the DISD Board (ii) adopted an "official policy" or "policy by custom," which (iii) deprived Normore of her constitutional rights. *See Piotrowski*, 237 F.3d at 578-83. However, as determined above, there is no evidence on at least one element of Normore's acclaimed constitutional torts—her claims of due process violations; equal protection violation(s); and First Amendment retaliation. Normore's § 1983 claims do not pass the "threshold" requirement of the existence of a constitutional violation. *See Peterson*, 588 F.3d at 844; *Becerra*, 105 F.3d at 1047. The Court therefore pretermits—as unnecessary—discussion of whether any official policy existed that was a "moving force" in depriving Normore of her constitutional rights. *See Rivera*, 349 F.3d at 247.

## V.    NORMORE'S REMAINING DISCRIMINATION AND RETALIATION CLAIMS

### A.  Normore's Title VII Claims (Counts III and IV)

DISD asserts Normore cannot maintain her Title VII sex discrimination and retaliation claims because Normore lacks evidence on at least one element of each corresponding claim. In response, Normore refers the Court (i) to direct and circumstantial evidence on her Title VII sex discrimination claim and (ii) to circumstantial evidence on her Title VII retaliation claim.

*i.    Normore's Title VII Sex Discrimination Claim*

Under Title VII, "*it shall be an unlawful employment practice for an employer--to discharge any individual*, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, *sex*, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added).  In other words, "an employer who intentionally treats a person worse because of sex—such as by firing the

person for actions or attributes it would tolerate in an individual of another sex—discriminates against that person in violation of Title VII." *Bostock v. Clayton Cnty.*, 207 L. Ed. 2d 218, 140 S. Ct. 1731, 1740 (2020). "It doesn't matter if other factors besides the plaintiff's sex contributed to the decision." *Bostock*, 140 S. Ct. at 1741. "[I]f changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred." *Bostock*, 140 S. Ct. at 1741.

Normore first asserts direct evidence exists on her Title VII sex discrimination claim. Normore relies on the same evidence the Court has discussed hereabove in determining her sex-based equal protection claim. As the Court has determined that there is no direct evidence of sex-based discriminatory animus in the equal protection context, the result is the same in the Title VII sex discrimination discrimination context. *See Wallace*, 80 F.3d at 1047; *Lauderdale*, 512 F.3d at 166. Thus, the Court concludes there is no direct evidence of sex-based discriminatory animus under Title VII.

Absent direct evidence of sex-based discrimination, Normore must make a prima facie showing under the *McDonnell Douglas* framework that

> **(1)** she is a member of a protected class; **(2)** she was qualified for the position she sought; **(3)** she suffered an adverse employment action; and **(4)** others similarly situated but outside the protected class were treated more favorably.

*Saketkoo*, 31 F.4th at 997–98 (emphasis added in bold); *see, e.g.*, *Newbury v. City of Windcrest, Texas*, 991 F.3d 672, 679 (5th Cir. 2021) (discussing sex discrimination claim under Title VII). "To satisfy the "similarly situated" prong, the employee carries out a comparator analysis[;] . . . [u]nder this analysis, the employee must establish that she was treated less favorably than a similarly situated employee outside of her protected class in nearly identical circumstances." *Saketkoo*, 31 F.4th at 998 (internal citation omitted, footnote omitted).

Here, the Parties dispute whether there is evidence of this fourth element regarding a comparator. *See Saketkoo*, 31 F.4th at 998. As the Court has determined that Normore failed to establish a "similarly situated" employee in Normore's sex-based equal protection claim, the result is the same for Normore's Title VII sex discrimination claim. *See Wallace*, 80 F.3d at 1047; *Lauderdale*, 512 F.3d at 166. Here, the record is devoid of evidence of any male employee who punched a co-worker at an off-campus, work-related event with students' parents attending. That is, the record is devoid of evidence of a comparator who (i) is male and (ii) was treated more favorably in "nearly identical circumstances." *See Saketkoo*, 31 F.4th at 998. No evidence in the record supports the fourth element of Normore's Title VII sex discrimination claim. Thus, the Court must conclude that Normore fails to establish a prima facie case of sex-based discrimination in violation of Title VII. Correspondingly, the Court GRANTS DISD's motion for summary judgment as to Normore's Title VII sex discrimination claim.

ii.     *Normore's Title VII Retaliation Claim*

As pleaded and briefed, Normore's remaining Title VII claim is based on her termination at DISD. Normore has presented no direct evidence of retaliation. Thus, the Court must "apply the *McDonnell Douglas* burden-shifting framework in determining whether [Plaintiff] has established a prima facie case of retaliation." *Richards*, 804 F. App'x at 215 (addressing retaliation claim asserted under Title VII). "To establish a prima facie case of retaliation, [a plaintiff] must show that: 1) she engaged in a protected activity; 2) she suffered an adverse employment action; and 3) there is a causal connection between the two. *Owens*, 33 F.4th at 835.

"'An employee has engaged in protected activity when she has (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title

VII.'" *Thompson v. Somervell Cnty., Tex.*, 431 F. App'x 338, 341 (5th Cir. 2011) (quoting *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372 (5th Cir. 1998) (internal citations omitted)). "Adverse employment decisions are ultimate employment decisions such as hiring, granting leave, discharging, promoting, . . . compensating, or demoting. *Thompson v. Microsoft Corp.*, 2 F.4th 460, 470 (5th Cir. 2021) (internal quotation omitted).[27]

"A 'causal link' is established when the evidence demonstrates that 'the employer's decision to terminate was based in part on knowledge of the employee's protected activity.'" *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001) (quoting *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998)). Thus, an employer cannot retaliate against an employee if the employer's decisionmaker for the adverse employment decision did not know that the employee had engaged in protected activity at the time of the alleged retaliatory actions. *Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir. 1999) (concluding employer could not have retaliated against employee because the employer's decisionmaker did not now of employee's alleged protected activity); *see also Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 n.6 (5th Cir. 2003) ("If the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said (even as an initial matter) that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity."). "[T]he mere fact that some adverse action is taken after an employee engages in some protected activity will not always be enough for a prima facie case." *Owens*, 33 F.4th at 835 (quoting *Swanson v. GSA*, 110 F.3d 1180, 1188 n.3 (5th Cir. 1997)). "To establish causality, the protected activity and the adverse action must have

---

[27] Courts use the terms "adverse employment action" and "adverse employment decision" interchangeably. *See, e.g.*, *Thompson v. Microsoft Corp.*, 2 F.4th 460, 470 (5th Cir. 2021); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) ("an adverse employment action consists of ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating" (internal quotation omitted)).

'very close' temporal proximity, and 'a five month lapse is not close enough . . . to establish the causal connection element of a prima facie case of retaliation.'" *Newbury*, 991 F.3d at 679 (quoting *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020)).

Regarding protected activity, DISD asserts the following constituted Normore's protected activities: (i) Normore's July to August 2016 Grievance; (ii) Normore's August 2016 Personnel Complaint; (iii) Normore's December 16, 2016 OCR Complaint; and (iv) Normore's April 21, 2017 EEOC Intake Questionnaire. In response, Normore refers to her opposition to sex discrimination at Pinkston as her protected activity; however, Normore's cited evidence in her corresponding briefing refers the Court to: (i) letters from the Department of Education to Superintended Dr. Michael Hinojosa and Shirley A. Richardson; (ii) Simmons's investigation regarding the Punching Incident; (iii) correspondence between Simmons, Kendra Henderson, and Juan Vega, which attached documents relating to the Punching Incident investigation; (iv) Simmons's termination recommendation from June 2, 2017; and (v) correspondence between Simmons and Morin regarding the Punching Incident investigation. (ECF No. 151 at 36-37). However, none of this cited evidence shows what constituted Normore's protected activity in the Title VII context—much less when the alleged protected activity occurred.

Nevertheless, the record is definitive regarding the third element of causation for Normore's Title VII retaliation claim. It is undisputed that the DISD Board—consisting of Flores, Solis, and Pinkerton—served as DISD's decisionmaker for Normore's termination. First, the record contains no evidence of a "very close" temporal proximity between (i) Normore's Grievance, (ii) Personnel Complaint, or (iii) OCR Complaint in 2016 and the DISD Board's decision to terminate Normore on February 15, 2018. Second, the record does not show the DISD Board was aware of Normore's Grievance or Personnel Complaint; and, although the record shows

the OCR Complaint and EEOC Intake Questionnaire were produced to DISD during the TEA Appeal, no evidence in the record shows the DISD Board relied on, was aware of, or was otherwise influenced by the either the OCR Complaint or the EEOC Intake Questionnaire.[28]

On causation, Normore's briefing focuses on (i) Simmons (ii) employees at DISD who were involved in the Punching Incident investigation and (iii) Superintendent Hinojosa. (ECF No. 141 at 36-37). However, none of those individuals served as the decisionmaker in her termination—that is, Normore's references do not relate to the DISD Board of Flores, Solis, and Pinkerton. Although Normore asserts her termination occurred "based in part" on Normore's allegations of discrimination "internally," Normore refers to the Court to no supporting evidence, and the Court has found none. (ECF No. 151 at 36-37). Normore otherwise does not address the Grievance, Personnel Complaint, OCR Complaint, or EEOC Intake Questionnaire in the Title VII retaliation context.

Here, even if the Court were to assume *arguendo* that all of Normore's referred evidence constituted protected activity under Title VII, the Court must conclude there is no evidence in the record to support the causality element of Normore's Title VII retaliation claim. The Court must conclude that Normore fails to establish a prima facie case of sex-based retaliation in violation of Title VII. Correspondingly, the Court GRANTS DISD's motion for summary judgment as to Normore's Title VII retaliation claim.

### B.  Normore's ADEA Claims (Counts VII and VIII)

DISD asserts Normore cannot maintain her ADEA age discrimination and retaliation claims because (i) on her ADEA age discrimination claim, DISD has produced evidence of a

---

[28] At the February 15, 2018 open hearing, Normore's counsel did not argue or allege that DISD's proposed termination was in retaliation for engaging in activity to report or oppose employment discrimination.

legitimate, non-discriminatory reason for her termination and there is no evidence of pretext and (ii) on her ADEA retaliation claim, Normore lacks evidence of causation. In response, Normore refers the Court to purported evidence of pretext regarding age discrimination. Normore offers no response or briefing relating to her ADEA retaliation claim, so she has abandoned that claim. *See Black*, 461 F.3d at 588 n.1; *Hargrave*, 710 F.2d at 1164.

   i.  *Normore's ADEA Age Discrimination Claim*

  "The ADEA . . . prohibit[s] an employer from discharging an employee on account of that employee's age." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015). Normore offers no direct evidence on her ADEA age discrimination claim,[29] so the burden-shifting framework articulated in *McDonnell Douglas* applies. *Goudeau*, 793 F.3d at 474 (applying *McDonnell Douglas* framework to ADEA age discrimination claim). In *Goudeau*, the Fifth Circuit explained

> Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case of age discrimination by showing that **(1)** [s]he was discharged; **(2)** [s]he was qualified for the position; **(3)** [s]he was within the protected class at the time of discharge; and **(4)** [s]he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of [her] age.

793 F.3d 470, 474 (5th Cir. 2015) (quoting *Machinchick v. PB Power, Inc.,* 398 F.3d 345, 350 (5th Cir. 2005) (emphasis added in bold, internal citation and quotation marks omitted). Here, DISD does not challenge that Normore can make a prima facie case of ADEA age discrimination under the *McDonnell Douglas* framework.

  Thus, the Court next turns to the second step of the analysis—whether DISD has produced evidence that "articulate[s] a legitimate, nondiscriminatory reason for the termination. *Goudeau*,

---

[29] Normore asserts there are "statements" from Simmons that serve as direct evidence, but Normore does not direct the Court to any such corresponding evidence. (*See* ECF No. 151 at 38).

793 F.3d 470, 474; *see Reeves*, 530 U.S. at 142. The record shows the DISD Board believed Normore punched Dukes. Indeed, the record of the TEA Appeal Hearings; IHE Recommendation; and February 15, 2018 open hearing, focus almost entirely on the Punching Incident. Thus, the Court must conclude that DISD has produced evidence of a legitimate, non-discriminatory reason for the DISD Board's termination decision—the Punching Incident.

The Court next turns to the third step of the analysis—whether Normore has countered with "substantial evidence" that the Punching Incident reason for her termination is pretextual. *See Owens*, 33 F.4th at 825. The Fifth Circuit has explained:

> "Under the ADEA, the employee must 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Squyres*, 782 F.3d at 231 (quoting *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097). *The ADEA thus requires a showing of "but-for" causation. See Squyres,* 782 F.3d at 231 (citations omitted).

*Goudeau*, 793 F.3d at 474–75 (emphasis added). Thus, Normore must show evidence that the Punching Incident was pretext for age-based discrimination. "The ADEA thus requires a showing of 'but-for' causation." *Goudeau*, 793 F.3d at 475. "[T]he plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Goudeau*, 793 F.3d at 476 (internal quotation omitted)

Normore first asserts DISD has conceded "Simmons's participation in the decision to terminate Normore and his age-based comments and the District's age-based disparate treatment." (ECF No. 151 at 38). However, the record contains no such concession. Next, Normore refers the Court to her November 2016 complaint, which states:

> Age discrimination:
> Shots in the arm, but we always went to playoffs.
> Teacher L. Paliparte and ROTC Rangel and a Delon – heard you are retiring and so you are being put on the excess teacher list. Older people out and younger people in.

(ECF No. 114-2 at 162). The last evidence Normore directs the Court is testimony from a former Pinkston teacher: (i) based on "rumors" of "a lot of teachers . . . getting terminated," (ECF No. 152 at 10); (ii) regarding access to Pinkston facilities (ECF No. 152 at 10-11); (iii) regarding other teachers' performance, (ECF No. 152 at 13); and (iv) of Simmons's "standard" to terminate older teachers "whenever we were accused of doing pretty much anything," (ECF No. 152 at 14-15). Normore refers the Court to no other evidence.[30]

As cited, none of the evidence shows the DISD Board's decision to terminate Normore based on the Punching Incident reason is pretextual. The evidence does not show the DISD Board decided to terminate Normore because of her age. Notwithstanding, Normore asserts the DISD Board was influenced by Simmons's discriminatory animus, but Normore directs us to no corresponding evidence. The Court has found no such evidence the in record (i) of corresponding discriminatory animus from Simmons or (ii) of Simmons's influence on the DISD Board's decision to terminate Normore. Upon review of the summary judgment evidence, the record is devoid of evidence that shows DISD's Punching Incident reason for the termination was pretextual in the ADEA age discrimination context. Therefore the Court GRANTS DISD's motion for summary judgment as to Normore's ADEA age discrimination claim.

### C. Normore's Title IX Claims (Count II).

Title IX states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). The Supreme Court has explained that Title IX is "designed primarily to prevent recipients of federal

---

[30] Normore appears to assert DISD or the DISD Board did not provide her an "opportunity to show the discriminatory intent," but Normore cites no part of the record, and the Court has found no corresponding evidence in support. (*See* ECF No. 151 at 38-39).

financial assistance from using the funds in a discriminatory manner." *Gebser v. Lago Vista Indep.*

*Sch. Dist.*, 524 U.S. 274, 292 (1998).

> Title IX's contractual nature has implications for our construction of the scope of available remedies. When Congress attaches conditions to the award of federal funds under its spending power, U.S. Const., Art. I, § 8, cl. 1, as it has in Title IX and Title VI, we examine closely the propriety of private actions holding the recipient liable in monetary damages for noncompliance with the condition. *See Franklin, supra,* at 74–75, 112 S.Ct., at 1037; *Guardians, supra,* at 596–603, 103 S.Ct., at 3229–3230 (White, J.); *see generally Pennhurst, supra,* at 28–29, 101 S.Ct., at 1545–1546. Our central concern in that regard is with ensuring that "the receiving entity of federal funds [has] notice that it will be liable for a monetary award." *Franklin, supra,* at 74, 112 S.Ct., at 1037.

*Gebser*, 524 U.S. at 287. The Supreme Court has recognized that Title IX is enforceable through

an individual's private right of action. *See Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of*

*Educ.*, 526 U.S. 629, 639 (1999) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979)

and *Franklin v. Gwinnett Cty. Public Schs.*, 503 U.S. 60 (1992)).

The language of the anti-retaliation provision of Title IX and that of Title VII are similar

and "should be accorded a similar interpretation." *Lowrey v. Texas A & M Univ. Sys.,* 117 F.3d

242, 252 n. 18 (5th Cir. 1997) (citations omitted). To establish a prima facie case of retaliation, the

plaintiff must show that: (1) she engaged in a protected activity, (2) she suffered an adverse

employment action, and (3) a causal connection exists between the protected activity and the

adverse employment action. *Willis v. Cleco Corp.,* 749 F.3d 314, 317 (5th Cir. 2014); *see, e.g.*,

*Bonnewitz v. Baylor Univ.*, No. 621CV00491ADADTG, 2022 WL 2688399, at *2 (W.D. Tex. July

12, 2022) (applying the same elements to a Title IX retaliation claim). In addressing what

constitutes protected activity under Title IX, another federal district court has explained:

> To engage in protected activity under Title IX, an employee must " 'step outside the role' [of representing the company] or otherwise make clear to the employer that the employee was taking a position adverse to the employer." *See Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 628 (5th Cir. 2008).[] In addition, the adverse position taken by the employee must be based on " 'a reasonabl[e] belief

that the employer was engaged in unlawful [Title IX] practices." *See Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000) (quoting *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. 1981)).

*Alva v. Texas A&M Int'l Univ.*, No. 5:17-CV-144, 2018 WL 5634983, at *5 (S.D. Tex. Oct. 31, 2018) (footnote omitted).[31] "[T]here must be a 'causal connection' between the Title IX complaint and the adverse employment action." *Taylor-Travis v. Jackson State Univ.*, 984 F.3d 1107, 1119 (5th Cir.), *cert. denied*, 211 L. Ed. 2d 28, 142 S. Ct. 101 (2021). "A retaliation plaintiff must show that the funding recipient or its representatives took an adverse action against [her] because [s]he complained of discrimination[;] [t]hat typically means the funding recipient itself signed off on the adverse action." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 586 (5th Cir. 2020) (internal citation omitted); *see, e.g., Knighton v. Univ. of Texas at Arlington*, No. 4:18-CV-00792-P-BP, 2021 WL 9881105, at *5 (N.D. Tex. May 24, 2021), *report and recommendation adopted*, No. 4:18-CV-00792-P, 2021 WL 2337167 (N.D. Tex. June 8, 2021).

i.      *Normore's Title IX Retaliation Claims*

Here, Normore's Title IX retaliation claims are based on Normore's "reporting gender inequalities in athletics and Pinkston." (ECF No. 151 at 41). *Inter alia*, DISD asserts Normore has no evidence of a causal relationship between any protected activity and either her removal as AAC or her termination. (ECF No. 122 at 59). In response, Normore asserts (i) various protected activities; (ii) that DISD had actual knowledge of intentional sex discrimination; and (iii) that the

---

[31] The *Alva* Court notes the comparable standards in Fair Labor Standards Act and Title IX claims in a footnote, as follows:

> The Fair Labor Standards Act (FLSA) is another analog for the relatively novel legal standards in a Title IX case. *See Atkinson v. Lafayette Coll.*, 653 F. Supp. 2d 581, 598 (E.D. Pa. 2009) (explaining that the FLSA and Title IX have the same prima facie case elements for retaliation claims and using the FLSA standard for protected activity for a Title IX claim).

*Alva v. Texas A&M Int'l Univ.*, No. 5:17-CV-144, 2018 WL 5634983, at *5 at n.4 (S.D. Tex. Oct. 31, 2018).

---

MEMORANDUM OPINION AND ORDER                                          Page **43** of **59**

record shows her participation in the Title IX protected activity caused her termination. It is undisputed that Normore suffered an adverse employment action—termination from work at DISD. The Court next addresses the Parties' respective arguments regarding Normore's protected activity and causality as it relates to both Normore's removal as AAC and her termination.[32]

A)  Title IX Retaliation – AAC Removal

Regarding Normore's removal as AAC, DISD avers that it is "unclear" what constituted her corresponding Title IX protected activity. (ECF No. 122 at 59-60). In response, Normore refers the Court to evidence of her reporting "gender inequalities in athletics at Pinkston to the Athletic Department." (ECF No. 151 at 41). Normore's cited evidence is comprised of discussion and correspondence regarding Normore's opinion of the Pinkston weight equipment facilities and her desire for a female weight room. One email from Normore states:

> The weights are too heavy, the girls have to work up to lifting the bar. We have to hold the 5, 10 lb. round plates by the center hole. The pads are cracked, and backs are not sturdy. Also, It's not enough space, we run into the football team, boys basketball and sometimes the wrestling team. Also, having our own space will be a confidence booster for the girls when they do not have to worry about the boys watching them.

(ECF No. 114-1 at 323). Normore directs the Court to photos of Pinkston's weight room, girl's lockers, and Pinkston's gymnasium floors. Normore directs the Court to testimony from Dukes, in which he testifies the girls and boys athletics worked out "at the same period . . . in the same general areas," but that the girls "very rarely, if ever, use[d] the weight room." (ECF No. 153 at 42).

Here, the cited material regarding Normore's AAC Title IX protected activity does not show Normore "stepping outside" of her role as an AAC and coach of the girls' basketball team.

---

[32] Because Normore advances retaliation claims for both adverse employment actions of her removal as AAC and her termination, the Court refers to each claim as "AAC Title IX" and "retaliation Title IX," respectively.

Instead, her cited discussion of complaints are limited to the Pinkston Athletics Department. The record of her alleged AAC Title IX protected activity does not show that her actions were taking a position adverse to the employer. Normore provides no briefing as to how Dukes's testimony could constitute her own protected activity, and the Court has found no support, thereof.

Nonetheless, in her argument that such evidence constituted AAC Title IX protected activity, Normore refers the Court to two cases: (i) *Collins v. Jackson Pub. Sch. Dist.*, 58 F. Supp. 3d 705, 710 (S.D. Miss. 2014), *aff'd*, 609 F. App'x 792 (5th Cir. 2015) and (ii) *Gomez-Perez v. Potter*, 553 U.S. 474, 481 (2008). However, neither of these cases support Normore's AAC Title IX protected activity arguments. First, in *Collins*, the Title IX protected activity before that court involved a plaintiff's power point presentation entitled "Unfair Playing Fields: an investigation of Sports–Programs, Facilities, and Funding in the Jackson Public School District of Mississippi" shown during a school district meeting that included parents and school officials in attendance. *Collins*, 58 F. Supp. 3d 705, 707, 710. The *Collins* court explained:

> As previously discussed though, [plaintiff] was the drafter of the initial Title IX grievance. In fact, [plaintiff] was more than the drafter. [Plaintiff] was also the conductor. [Plaintiff] produced and conducted a power point presentation before Dr. Edwards during the meeting with the concerned parents. That power point presentation exhibited the gender disparities between athletic facilities in the school district. Docket No. 77, at 3. At that meeting, [plaintiff] also gave Dr. Edwards the report which he prepared, titled "UNFAIR PLAYING FIELDS: an investigation of Sports—Programs, Facilities, and Funding in the Jackson Public School District of Jackson Mississippi." [Plaintiff's] participation in these ways creates a reasonable inference that his journalistic contribution was indeed an act of "speak[ing] out." *Jackson,* 544 U.S. at 179, 125 S.Ct. 1497. He was personally engaged in the meeting—in the speaking out.

*Collins*, 58 F. Supp. 3d 705, 710 (footnote omitted). By comparison, Normore's alleged AAC Title IX protected activity involved no presentation to parents, no school district meeting, nor report of any kind. That is, the record does not show Normore "spoke out" in a manner that constituted the Title IX protected activity in *Collins*. Second, Normore's citation of *Gomez-Perez* refers to a

discussion of *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005), so the Court compares Normore's acts to those alleged in *Jackson* instead of *Gomez-Perez*.[33] *Jackson* involved a determination at the motion to dismiss stage. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171–72 (2005). The Supreme Court reversed the 11th Circuit in affirming a district court's grant of a motion to dismiss. *Jackson*, 544 U.S. at 184. *Jackson* did not discuss evidence or the merits of that plaintiff's alleged Title IX protected activity; *Gomez-Perez* contains no discussion on protected activity. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171–72; *Gomez-Perez*, 553 U.S. 474. Thus, Normore's reliance is inapposite.

Assuming *arguendo* such activity constituted Title IX protected activity, there is no evidence in the record that Simmons—who decided to remove Normore as AAC—(i) knew of such protected activity or (ii) was motivated to remove Normore from the AAC position because she engaged in such protected activity. *See Watts*, 170 F.3d at 512. The evidence Normore cites in this section is dated after Simmons removed Normore as AAC. (ECF No. 151 at 44-46; *see, e.g.*, ECF No. 144-2 at 96-102; ECF No. 114-10 at 31, 35; ECF No. 114-39 at 21). None of the summary judgment evidence shows a retaliatory animus from Simmons regarding his removal of Normore's AAC position. For those reasons, the Court must conclude Normore failed to establish a prima facie case of retaliation as to her AAC removal. As the record is devoid of evidence of a corresponding protected activity and causal connection, the Court GRANTS DISD's motion for summary judgment as to Normore's AAC Title IX retaliation claim.

---

[33] *Gomez-Perez* involved no Title IX claims but, rather, ADEA claim(s). *Gomez-Perez v. Potter*, 553 U.S. 474, 477 (2008).

B) <u>Title IX Retaliation - Termination</u>

For Title IX protected activity that relates to her termination, Normore refers the Court to various documents and evidence relating to the Painting Incident; Grievance; Personnel Complaint; and OCR Complaint. (ECF No. 151 at 41-42). As to Normore's termination Title IX retaliation claim, the Court assumes without deciding that these acts constitute Normore's engagement in Title IX protected activity.

Here, the record does not support the causation element on Normore's termination Title IX retaliation claim. Although Normore refers the Court to the record, none of the evidence shows a causal connection to her termination—that Normore was terminated because she complained of Title IX-related discrimination. The record of the TEA Appeal Hearings; IHE Recommendation; and February 15, 2018 open hearing, contain no discussion of any Title IX-related activity or retaliation on the part of any DISD employee. Following these hearings and IHE Recommendation, the decisionmaker for Normore's termination was the DISD Board of Flores, Solis, and Pinkerton. Normore appears to assert Title IX retaliatory animus from Flores and Solis because they referred to the Grievance during the February 15, 2018 open hearing, but the corresponding cited evidence is not evidence of retaliatory animus—the citation refers to Solis's errant reading of the TEA Appeal record.[34] (ECF No. 151 at 48). The record is otherwise devoid of evidence that the DISD

---

[34] During the end of the February 18, 2015 hearing, the following exchange occurs between Solis and Flores:

> Solis: Mr. Chair, I move that we adopt and approve the findings of fact and decisions of the Level 2 hearing officer and that the grievance of Terry Normore be and it is hereby denied.

> Flores: I think that's the - - So this is our –

> Solis: I read the wrong one. I'm sorry. That we adopt and approve the findings of fact and conclusions of law and that the decision of the independent hearing examiner, that the employment contract of Terry Normore be and it is hereby, sorry, terminated.

(ECF No. 123-12 at 6).

---

MEMORANDUM OPINION AND ORDER <span style="float:right">Page **47** of **59**</span>

Board was motivated by retaliatory animus for any of Normore's purported termination Title IX protected activity when it made the decision to terminate Normore's employment. Here, none of the summary judgment evidence shows a retaliatory animus from DISD regarding Normore's assumed termination Title IX protected activity. The Court must conclude there is no evidence in the record to support the causality element of Normore's termination-related Title IX retaliation claim. Correspondingly, for those reasons, the Court GRANTS DISD's motion for summary judgment as to Normore's termination Title IX retaliation claim.

## VI.   PRETEXT AND MIXED-MOTIVE CONSIDERATIONS REGARDING § 1983, TITLE VII, AND TITLE IX CLAIMS[35]

### i.    Traditional McDonnell Douglas Pretext

As determined above, Normore has failed to direct the Court to evidence on at least one essential element for each of her claims asserted under § 1983, Title VII, and Title IX. Apart from her ADEA age discrimination claim, addressed hereabove, Normore has failed to make out a prima facie case for discrimination and retaliation as required and the burden does not shift to the Defendants. *See, e.g.*, *Haynes v. Pennzoil Co.*, 207 F.3d 296, 301 (5th Cir. 2000) (ending its analysis and affirming district court's grant of summary judgment after concluding plaintiff "failed to establish a prima facie case of racial discrimination under Title VII"); *Owens* 33 F.4th at 835 (applying the *McDonnell Douglas* framework to a retaliation claim under Title VII and 42 U.S.C. § 1981). Nevertheless—assuming *arguendo* that Normore met her burden to show a prima facie case—DISD produced evidence of a legitimate, non-discriminatory, and non-retaliatory reason for both the AAC removal and terminating Normore's employment. *Owens*, 33 F.4th at 835 (discussing pretext in the discrimination context); *Feist v. Louisiana, Dep't of Just.,*

---

[35] *See Arceneaux v. Assumption Par. Sch. Bd.*, 733 Fed. App'x 175, 178–79 (5th Cir. 2018) (noting the Fifth Circuit has not explicitly adopted the *McDonnell Douglas* framework in Title IX cases, but courts apply it nonetheless).

*Off. of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (discussing pretext in the retaliation context); *see Eversley v. MBank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988). Here, DISD produced evidence of one overarching reason for the AAC removal—Normore painted a Pinkston classroom without permission from Simmons. DISD produced evidence of one overarching reason for Normore's termination—DISD believed Normore punched a co-worker at an off-campus, work-related event with students' parents attending.

Next, under the third step of the *McDonnell Douglas* framework, Normore must counter the Painting Incident and Punching Incident reasons with "substantial evidence" for her respective AAC removal and termination as pretextual. *See Owens*, 33 F.4th at 825; *see also Vaughn*, 665 F.3d at 637. For pretext in the discrimination context, the Fifth Circuit has explained:

> The plaintiff must rebut each nondiscriminatory reason articulated by the employer. *Wallace,* 271 F.3d at 220. A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or "unworthy of credence." *Id.; Reeves,* 530 U.S. at 143, 120 S.Ct. at 2106. An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action. *See Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 899 (5th Cir.2002).

*Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (addressing discrimination claims under Title VII and the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978). "Disparate treatment occurs where an employer treats one employee more harshly than other 'similarly situated' employees for 'nearly identical' conduct." *Vaughn*, 665 F.3d at 637. For pretext in the retaliation context, the Fifth Circuit has explained: "[a]n employee establishes pretext by showing that the adverse action would not have occurred "but for" the employer's retaliatory reason for the action." *Hague v. Univ. of Texas Health Sci. Ctr. at San Antonio*, 560 F. App'x 328, 336 (5th Cir. 2014).

Regarding pretext in the discrimination context, Normore first asserts disparate treatment by referring the Court to evidence in the record, but the cited evidence fails to show instances where DISD treated Normore more harshly than other 'similarly situated' employees for 'nearly identical' conduct. *See Vaughn*, 665 F.3d at 637. As discussed above, the summary judgment evidence does not support Normore's purported male comparators, and further review of the record does not support a showing of 'similarly situated' female comparators. Furthermore, the record contains no evidence of any DISD employee who engaged in—or was believed to have committed—the 'nearly identical' conduct of either (i) painting a classroom without the principal's permission or (ii) punching a coworker at an off-campus, work-related event with students' parents attending. *See Giles*, 655 F. App'x at 1002; *Lee*, 574 F.3d at 260. Normore next asserts the Punching Incident reason for her termination is unworthy of credence by referring the Court to (i) unsupported complaints that DISD "disregarded" evidence its determination on the Punching Incident; (ii) unsupported complaints regarding her termination and TEA Appeal process; (iii) Simmons's and Dukes's testimony on the Punching Incident; (iv) purported awareness from "Board Member Lew Blackburn" regarding male teachers hitting students; and (v) an invitation to a "West Dallas Community Parent Meeting." (ECF No. 151 at 33-34). Normore further points to other evidence regarding the Punching Incident and its corresponding investigation. Notwithstanding, none of the evidence Normore cites rebuts the Punching Incident as the real reason for her discharge. *See Laxton*, 333 F.3d at 578. Normore generally avers that Simmons's discriminatory animus influenced or controlled the DISD Board, but no evidence in the record supports such a contention. Normore appears to assert that DISD provided inconsistent or conflicting explanations for Normore's termination, but the record contains no such evidence. There is no evidence in the record that the Punching Incident reason for DISD's termination of

Normore's employment is "unworthy of credence." Furthermore, Normore offers no briefing relating to pretext as to her removal as AAC in the discrimination context, and the Court has found no evidence in the record in support, thereof.

Regarding pretext in the retaliation context, Normore's briefing contains two citations to the record: (i) argument from DISD's counsel during the TEA Appeal and (ii) a notification letter from the Department of Education about Normore's OCR Complaint that Superintendent Hinojosa received on April 14, 2017. (ECF No. 151 at 37). Neither of the cited evidence shows establishes pretext by showing that Normore's AAC removal or termination would not have occurred "but for" any retaliatory reason from DISD. Normore next avers:

> DISD was aware of Normore's participation in the sex discrimination investigation against Simmons being conducted by the PSO. It is also undisputed that the Board would have allowed Normore go to another DISD school if she broadly released her retaliation claims against DISD, which evidences the Board's retaliatory bias.

(ECF No. 151 at 37). First, Normore's briefing shows no causation that DISD's awareness of the investigation against Simmons caused or created any retaliatory motive from the DISD Board, and the Court has found no evidence in support, thereof. Second, although Normore's briefing on DISD's proposed release (as settlement) cites no document, DISD's reply directs the Court to Normore's appendix—which contains a conditional release offer dated February 8, 2018, apparently offered before the IHE Recommendation. DISD argues this constitutes confidential settlement communications that are covered under Federal Rule of Evidence 408, and the Court agrees. As another court in this District has explained:

> Under the Federal Rules of Evidence, "conduct or statements made in compromise negotiations regarding [a] claim" are "not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of [the] claim." Fed. R. Evid. 408(a); *cf.* Fed. R. Evid. 408(b) (authorizing courts to "admit this evidence for another purpose").

And because the Court may only consider admissible evidence in the summary judgment context, it may not consider evidence of the parties' settlement negotiations to defeat a summary judgment motion. *See C.R. England & Sons, Inc. v. Atchison, Topeka & Santa Fe Ry. Co.*, 924 F. Supp. 757, 761 (N.D. Tex. 1996) (Sanders, J.); *see also McCloud v. McDonough*, 2022 WL 1230303, at *2 (N.D. Tex. Feb. 4, 2022) (Rutherford, J.) (striking portions of summary judgment response that describe confidential settlement negotiations), *rec. accepted*, 2022 WL 682747 (N.D. Tex. Mar. 8, 2022) (Starr, J.).

*Cici Enterprises, LP v. TLT Holdings, LLC*, No. 3:21-CV-02121-S-BT, 2022 WL 17657576, at *2 (N.D. Tex. Nov. 18, 2022), *report and recommendation adopted sub nom. Cici's Enterprises, LP v. TLT Holdings, LLC*, No. 3:21-CV-2121-S-BT, 2022 WL 17631529 (N.D. Tex. Dec. 13, 2022). As such, the Court may not consider such settlement negotiations between Normore and DISD as summary judgment evidence. Even if the Court were to take such facts as undisputed, such a settlement offer is not evidence that either the AAC removal or the termination would not have occurred "but for" a retaliatory reason from DISD.

Here, the record is devoid of evidence that shows pretext that Normore's removal as AAC or termination would not have occurred "but for" any retaliatory reason from DISD. For the foregoing reasons, the Court must conclude that Normore fails to present substantial evidence that DISD's reasons for (i) the AAC removal—the Painting Incident—and (ii) the discharge—the Punching Incident—are false, unworthy of credence or not true in either the discrimination or retaliation contexts. Thus, the Court must conclude the record contains no evidence of pretext.

### ii.    *Modified McDonnell Douglas and Mixed-Motive(s)*

The Fifth Circuit "has adopted use of a 'modified *McDonnell Douglas* approach' in cases where the mixed-motive analysis may apply." *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005). The modified *McDonnell Douglas* approach differs from the traditional *McDonnell Douglas* approach after the plaintiff has made a prima facie showing and defendant

has responded with a legitimate, nondiscriminatory reason for the adverse employment action. *Keelan*, 407 F.3d at 341.

> the plaintiff must then offer sufficient evidence to create a genuine issue of material fact 'either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive[s] alternative).

*Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (internal quotation marks and citations omitted). The *Rachid* Court further recognized:

> "A mixed-motives case arises when an employment decision is based on a mixture of legitimate and illegitimate motives.... If the employee proves the unlawful reason was a motivating factor, the employer must demonstrate that it would have taken the same action in the absence of the impermissible motivating factor."

*Rachid*, 376 F.3d at 309–10 (quoting *Louis v. E. Baton Rouge Parish Sch. Bd.,* 303 F.Supp.2d 799, 801–04 (M.D.La.2003) (citing *Medlock v. Ortho Biotech, Inc.,* 164 F.3d 545, 553 (10th Cir.1999) (noting that a mixed-motives analysis applies "where the evidence is sufficient to allow a trier to find both forbidden and permissible motives.") (quotations and citations omitted)).

The Parties limit their briefing regarding mixed-motive analysis to Normore's Title VII sex discrimination claim. Here, the Court (i) assumes *arguendo* that Normore met her burden to show a prima facie case and (ii) recognizes DISD produced evidence a legitimate, non-discriminatory, and non-retaliatory reason for terminating Normore's employment—the Punching Incident.

DISD asserts there is no evidence of sex as a motivating factor behind Normore's termination. Although Normore briefs motivating factor(s) in her section on her Title VII sex discrimination claim, Normore refers the Court to no evidence that Normore's sex constituted a motivating factor in the pretext context. As concluded above in the Court's discussion of Normore's Title VII sex discrimination claim, no direct evidence of sex-based discrimination exists. Furthermore, the record contains no evidence that other individuals outside of Normore's

protected class were treated more favorably. Indeed, upon review of the summary judgment evidence, the record is devoid of evidence that sex was a motivating factor in DISD's decision to terminate Normore. The record contains no evidence of forbidden motives in regard to DISD's termination of Normore. To the contrary, the record shows only one motive for the termination—the Punching Incident. *See Rachid*, 376 F.3d at 309–10; *Medlock*, 164 F.3d at 553. The Court must conclude Normore has failed to carry her burden under the modified *McDonnell Douglas*—"mixed motive"—approach.

Otherwise, neither party has briefed that the application of the modified *McDonnell Douglas* approach is appropriate for any of Normore's other claims. Nevertheless, there is no evidence in the record that DISD had both legitimate and illegitimate reasons for discharging Normore. Thus, the Court declines application of the modified *McDonnell Douglas* framework as to those remaining claims and, correspondingly, pretermits any discussion of mixed-motive(s) regarding the AAC removal or termination. *See Keelan*, 407 F.3d at 341 (concluding the District Court committed no error in declining to reach the question of whether employee "created fact issues on either or both of pretext or mixed-motive" when no evidence existed as to both legitimate and illegitimate reasons for employee's discharge).

### VII.   DISD'S AFFIRMATIVE DEFENSES

Normore seeks summary judgment on DISD's affirmative defenses of (i) collateral estoppel; (ii) *Faragher/Ellerth* (failure to take advantage of any preventative or corrective opportunities provided by the employer)[36]; (iii) after-acquired evidence; and (iv) failure to mitigate. (ECF Nos. 125, 126). However, as adjudicated above, the Court has not relied on any of

---

[36] *See generally Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

those affirmative defenses. Thus, the Court DENIES Normore's motion for partial summary judgment as moot.

### VIII.   MOTIONS TO STRIKE, LEGAL STANDARD, AND BRIEFING CONCERNS

Here, the Parties have filed motions to strike the other Party's respective summary judgment evidence. (ECF Nos. 145, 158). As one court in the Northern District has discussed in the context of a motion to strike summary judgment evidence:

> Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). . . . . "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

*Appel v. Inspire Pharms., Inc.*, 712 F. Supp. 2d 538, 542 (N.D. Tex. 2010), *aff'd,* 428 F. App'x 279 (5th Cir. 2011). As another court in the Northern District has discussed in determining summary judgment:

> The court in deciding [movant's] motion will not take into account summary judgment evidence that [movant] has not cited in the manner required—that is, to each page of the appendix that supports each assertion that the party makes concerning the evidence. "Otherwise, [Rule 56.5(c)] would not mean what [it] say[s]." *See Andrews v. CompUSA, Inc.,* 2002 WL 265089, at *3 (N.D.Tex. Feb.21, 2002)( Fitzwater, J.). The court will not undertake a search of the appendix for evidence that would be sufficient to grant summary judgment in [movant's] favor.

> The court is not required to "comb the record" in search of summary judgment evidence. *See Doddy v. Oxy USA, Inc.,* 101 F.3d 448, 463 (5th Cir.1996) (citing *Jones v. Sheehan, Young & Culp, P.C.,* 82 F.3d 1334, 1338 (5th Cir.1996)). "Nor will the court overlook Rule 56.5(c), a valuable tool for busy trial courts that requires a party to place an issue clearly in focus by citing in its brief *each* page of the appendix that supports *each* assertion that it makes concerning the summary judgment evidence." *Andrews,* 2002 WL 265089 at *3.

*Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, No. CIV.A. 398CV2996D, 2002 WL 1751381, at *9 (N.D. Tex. Apr. 4, 2002). This Court agrees with the *Appel* and *Aspex Eyewear, Inc.* courts' reasoning and applies the same standards to the Parties in this case. *See Appel*, 712 F. Supp. 2d at 542; *Aspex Eyewear*, 2002 WL 1751381, at *9. The Court has not considered any evidence that did not meet these standards. In other words, evidence that did not fall within these standards was not considered and played no role in this decision.

Thus, the Court denies both respective motions to strike. As the Court has considered all of the competent summary judgment evidence before it—without striking any evidence—there is no evidence on at least one required element on each of Normore's claims. That is, even without striking evidence, nothing in the record creates a fact dispute that would preclude DISD's motion for summary judgment.[37] Thus, the Court DENIES the Parties' respective motions to strike summary judgment evidence as moot.

However, DISD's motion to strike raises serious concerns regarding Normore's briefing and citations to the record, which the Court likewise shares. Demonstrably, Federal Rule of Civil Procedure 56, *Ragas*, and the Northern District of Texas's Local Rules require Parties to support

---

[37] The Court further notes that many of the Parties' respective motions for summary judgment are based in general or boilerplate objections, which are invalid objections. *See OrchestrateHR, Inc. v. Trombetta*, 178 F.Supp.3d 476, 507 (N.D. Tex. 2016) (citing *Heller*, 303 F.R.D. at 483; quoting Fed. R. Civ. P. 34(b)(2)(C)), *objections overruled*, No. 3:13-cv-2110-KS, 2016 WL 5942223 (N.D. Tex. Oct. 13, 2016). Federal Rule of Civil Procedure 34(b)(2)(C) states: "*Objections.* An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest." Fed. R. Civ. P. 34(b)(2)(C).

assertions in the briefing with precise citations to the summary judgment evidence. Fed. R. Civ. P. 56(c)(1)(A-B); *Ragas*, 136 F.3d at 458; N.D. Tex. Loc. R. 56.5(c). But, throughout this opinion, the Court has noted that several of the assertions in Normore's briefing are unsupported by the record. In other words, Normore has failed to "identify specific evidence in the record and to articulate the precise manner in which that evidence supports [] her claim." *Ragas*, 136 F.3d at 458.[38] At several instances in her briefing, Normore cites only a single page of a multiple-page document, without articulating the precise manner in which that evidence supports her claim(s). Furthermore, significant assertions of fact in Normore's briefing contain no corresponding citation to the record.

Another serious concern the Court holds with Normore's briefing relates to her incorporations by reference. At various points in Normore's response to DISD's motion for summary judgment, Normore invites the Court to consider piecemeal statement of fact section(s) and argument(s) that she filed in previous, *separate* summary judgment motion filings—through incorporation by reference. (*See ,e.g.*, ECF No. 151 at 7 n. 88, 11; *see generally* ECF Nos. 113, 125). Such prior filings were not made in response to DISD's motion for summary judgment. Northern District of Texas Local Rule 56.5(b) requires that "the length of a principal brief must not exceed 50 pages." N.D. Tex. Loc. R. 56.5(b). Excluding Normore's invited incorporations from prior briefing, Normore's response brief to DISD's motion for summary judgment is 50 pages

---

[38] For example, Plaintiff's briefing states "In sum, the Board ignored the fact that Simmons was recommending termination for women based on admitted harmless conduct but not doing so for men." (ECF No. 151 at 57). Plaintiff includes a footnote and cites three documents: (i) a citation to a spreadsheet that is redacted but for the name of a person and terms, (ECF No. 114-41 at 96-97); (ii) a citation to hearing testimony that Simmons and Dukes were friends, (ECF No. 114-15 at 560); and (iii) a citation to a page of an investigation regarding a different DISD employee—a conclusion that the "preponderance of the evidence" did not support mistreatment or a policy violation. (ECF No. 114-16 at 95). None of these documents appear to involve the DISD Board or whether the DISD Board ignored the documents in "recommending termination for women based on admitted harmless conduct but not doing so for men." (ECF No. 151 at 57).

---

MEMORANDUM OPINION AND ORDER                                                              Page **57** of 59

in length. (ECF No. 151). Were the Court to consider the portions that Normore incorporates by reference, Normore's response brief would exceed the 50 page length limit found in Local Rule 56.5(b).[39] Normore did not seek leave to exceed the 50 page limit. Thus, the Court declines to consider Normore's briefing that is incorporated by reference. *See* N.D. Tex. Loc. R. 56.5(b).[40]

The Northern District has adopted attorney standards in *Dondi Properties Corporation v. Commerce Savings & Loan Association*, 121 F.R.D. 284, 285 (N.D. Tex. 1988). The Court reminds practitioners of the following pertinent standards from *Dondi*:

> (A) In fulfilling his or her primary duty to the client, a lawyer must be ever conscious of the broader duty to the judicial system that serves both attorney and client.
>
> (B) A lawyer owes, to the judiciary, candor, diligence and utmost respect.
>
> (C) A lawyer owes, to opposing counsel, a duty of courtesy and cooperation, the observance of which is necessary for the efficient administration of our system of justice and the respect of the public it serves.
>
> (D) A lawyer unquestionably owes, to the administration of justice, the fundamental duties of personal dignity and professional integrity.

*Dondi*, 121 F.R.D. at 287–88. Although the Court has not considered any sanction against Normore, the Court nevertheless cautions attorneys practicing in this District to comport (i) with *Dondi* and (ii) with the briefing requirements of the Federal Rules of Civil Procedure, Northern District's Local Rules, and respective judge's policies and procedures. The Court warns Parties that failure to comply to briefing requirements and *Dondi* could result in sanction.

---

[39] Some filings to which Normore refers by incorporation has already been adjudicated against her favor. *See Normore*, 2021 WL 5824764, at *8.

[40] The Fifth Circuit has further recognized the Court's inherent power "to control its own "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants" *In re Beebe*, 56 F.3d 1384 (5th Cir. 1995). Correspondingly, the Court recognizes that the Northern District of Texas's Local Rules exist as a means of docket control.

## IX.    Conclusion

For the reasons enumerated above, the Court GRANTS DISD's motion for summary judgment on all of Normore's remaining claims. The Court DENIES Normore's motion for partial summary judgment as moot. The Court DENIES the Parties respective motions to strike summary judgment evidence as moot. The Court shall enter a final judgment by separate filing.

**SO ORDERED.**

9th day of June, 2023.

_____

ADA BROWN
UNITED STATES DISTRICT JUDGE